HAFF v. PILLING et al.

(Circuit Court, E. D. Pennsylvania. January 20, 1905.)

No. 12.

1. SALES—FAILURE TO DELIVER—MEASURE OF DAMAGES.

Where a contract for the sale of coal, to be delivered in monthly quantities, provided that each month's delivery should be treated and considered as a separate and independent contract, the measure of the buyer's damages for the seller's failure to deliver the coal was the difference between the price he contracted to pay the seller, and the price which he was compelled to pay in the open market on the last day of each month for the amount of coal which the seller failed to deliver according to contract during the month.

[Ed. Note.—For cases in point, see vol. 43, Cent. Dig. Sales, § 1178.

2. SAME—EVIDENCE—MERITS OF CLAIM.

Evidence that the buyer was compelled to pay a higher price for coal in the open market than the price fixed by the contract of sale, whereas he was selling the coal to his customers at the figures at which he had originally contracted to sell it, while irrelevant on the issue of the seller's liability for the breach of his contract, goes to show that the buyer is not insisting upon his legal rights without merit.

3. SAME—DEFENSES.

The fact that the sellers of coal had themselves contracted for the purchase of sufficient coal to supply their customers had no bearing on the question of the sellers' liability for a breach of a contract for the delivery of coal to one of their customers, except as evidence that they had used every precaution to be prepared to deliver the coal in com-

pliance with the terms of their agreement, and were prevented from so doing solely by a shortage of cars.

**4. SAME—SHORTAGE OF CARS.**

The fact that sellers took the precaution to contract for sufficient coal before they sold it to their customers did not excuse them from the effort to secure cars to ship the coal in, or to procure coal for delivery, if, as a matter of fact, they could have, with reasonable expenditure of money, purchased coal in the open market, or secured the cars to ship the coal for which they had contracted.

H. B. Gill and Read & Pettit, for plaintiff.

Henry P. Brown and John G. Johnson, for defendants.

HOLLAND, District Judge. This is a motion for a new trial, for the reasons (1) the verdict was against the evidence; and (2) against the weight of the evidence.

Mr. Haff brought suit for the recovery of damages for the breach of contract into which he had entered with defendants for the delivery of coal. The dispute arose out of the following facts:

On August 20, 1902, Haff made a contract with the defendants for the delivery of 10,500 gross tons of "Sonman Shaft Bituminous Steam Coal," f. o. b. cars at piers Pennsylvania Railroad Company, South Amboy, N. J., in about equal monthly quantities between September 1, 1902, and April 1, 1903, which would be 1,500 tons per month for seven months, at $2.95 per ton. The contract contained the usual strike clause, and further it was stipulated as follows:

"It is understood and agreed that if there should be a shortage of cars, shipments will be divided from time to time in fair proportion on all orders. Each month's delivery to be treated and considered as a separate and independent contract."

The defendants, during the above-mentioned seven months, delivered, in accordance with their contract, to the plaintiff, at South Amboy, N. J., 2,232 tons of Sonman Shaft and 2,117 tons of other kinds of coal, making a total of 4,347 tons; the difference between this and the amount agreed to be delivered under the contract, to wit, 10,500 tons, being 6,153 tons. This amount the plaintiff was compelled to purchase in the open market during that time to fill contracts made by him, for which he was compelled to pay a much higher price.

If the plaintiff be entitled to recover for the failure of the defendants to comply with their contract to deliver this coal, the measure of his damage is the difference between the price he was to pay the defendants, and the price for which he was compelled to purchase in the open market at the last day of each month, for the amount of coal which the defendants failed to deliver according to contract during the preceding month, as the contract provides that each month's delivery is to be treated and considered as an independent contract. So that at the end of the month, if there was a failure on the part of the defendants to deliver the entire 1,500 tons, and the plaintiff was compelled to purchase any part thereof in the market at a higher price, he would be entitled to recover, if at all, for the difference. From the evidence, we learn that the plaintiff was required to purchase coal in the open market at an advance price for the purpose of supplying the 6,153 tons.

According to the plaintiff's evidence, the amount the defendants were short on delivery, and the months, the tons short, excess of market price, and total amount of excess paid, are as follows:

| Month. | Tons Short. | Excess of Market Price. | Damages. |
|--------|-------------|-------------------------|----------|
| September | 586 | $5 55 | $ 3,252 80 |
| October | 758 | 2 05 | 1,553 90 |
| November | 946 | 2 05 | 1,939 30 |
| December | 835 | 3 05 | 2,546 75 |
| January | 1,166 | 4 05 | 4,722 30 |
| February | 1,106 | 55 | 608 30 |
| March | 756 | 15 | 113 40 |
| | 6,153 | | $14,736 75 |

He, however, only claims damage in his statement to the amount of $12,943.66.

The defendants, in their affidavit of defense, allege that the reason for their failure to deliver the total amount of the coal contracted for was because of "an interruption of transportation, which resulted from a shortage of cars, and other causes entirely beyond their control." They further claim a delivery to the plaintiff, under the contract, of 4,347 tons, for which the plaintiff owed them $12,718.80, and advance charges on the coal for plaintiff's account $376.41, making a total of $13,095.21, and, having received from the plaintiff on account the sum of $12,503.38, claimed a balance due of $591.83.

The plaintiff had entered into contracts for the delivery of coal to his customers during the seven months involved in the contract in suit, and to one customer alone (the sugar refining company) he had obligated himself to deliver an amount of coal during the period in excess of that which he had contracted to purchase from the defendant, and in this contract he protected himself against strike contingencies.

The defendants, prior to August 20, 1902 (the date upon which they made the contract with the plaintiff for Sonman Shaft coal), entered into a contract with the Keystone Coal & Coke Company, on August 19, 1902, for 45,000 tons of Sonman Shaft coal, 6,000 tons of which were to be delivered monthly from September 1, 1902, to April 1, 1903, to the defendants; and on August 16, 1902, three days before, the Keystone Coal & Coke Company contracted for 45,000 tons of Sonman Shaft coal, to be shipped and delivered at the rate of 6,000 tons per month up to April 1, 1903; so that the defendants had contracts for sufficient coal to supply all their customers with whom they had contracted, as they allege, had they not been prevented from the performance thereof by reason of the shortage of cars. In support of their defense, they call officers of the Pennsylvania Railroad, and establish the fact that Sonman Shaft Coal Company was rated at 35 cars per day, and that they were unable to, and did not, furnish more than 7 per day, as there was a strike in the anthracite coal region, which largely increased the demand for soft coal, and the railroad company was un-

able to supply sufficient transportation to meet the increased demand. The defendants also showed they had sent a man specially employed by them to the mines, for the purpose of watching the number of cars received, in order that they might get their share of the coal shipped from Sonman Shaft; and they further testified that they called upon the railroad officials to ascertain whether or not more cars could not be had, but they were unsuccessful in obtaining them. There were shipped, however, to the defendants, Sonman Shaft coal to the amount of 10,864 tons, of which 9,383 tons reached South Amboy in cars in which it could be delivered there, and the defendants were not responsible for the failure of a delivery there of the remainder of this coal.

At the time this contract with the plaintiff was running, the defendants claim they had obligated themselves, during the same period, to deliver 14,000 tons of Sonman Shaft coal to Parrish, Phillips & Co., and 7,000 tons to Benedict, Downs & Co., and that, in accordance with their contract, that, in case of a shortage of cars, shipments would be divided from time to time in fair proportions on all orders, they were, in law, required to apportion the 9,383 tons to these customers, of the coal available for supplying contracts, in proportion to the amounts contracted for to these three parties, which defendants claim they actually did. The contracts, however, with Parrish, Phillips & Co. and Benedict, Downs & Co., showed upon their face that they were contracts for the delivery of Nonpareil coal; and the defendants offered evidence to show that, while the contracts called for Nonpareil, they were obliged to deliver Sonman Shaft. No witness, however, of either the firm of Parrish, Phillips & Co. or Benedict, Downs & Co., was called for the purpose of corroborating the claim of the defendants; and the plaintiff insisted that the written contract was to prevail, and that neither of these parties had any right to share in the 9,383 tons of Sonman Shaft coal which the defendants shipped to South Amboy, N. J.

It was established that there was much more Sonman Shaft coal mined and shipped than had been received by the defendants at South Amboy, and it was contended by the plaintiff that the defendants could have secured cars and purchased this Sonman Shaft coal in the open market to comply with the conditions of the contract, if they had made an effort and paid some advance therefor. Of the 9,383 tons of available Sonman Shaft coal, 2,230 tons were delivered to the plaintiff, 2,191 tons to Parrish, Phillips & Co., and 1,308 tons to Benedict, Downs & Co., leaving a balance of 3,654 tons, which the defendants claim they applied on other running contracts to replace other coal which they had taken to furnish on their contracts with the plaintiff, Parrish, Phillips & Co., and Benedict, Downs & Co.; but these other contracts, to which this balance of Sonman Shaft coal was diverted, were only running, verbal contracts of customers.

Under these circumstances, the plaintiff claimed that he was entitled to recover, and testified that he had actually been damaged to that extent, for the reason that he was compelled to pay a higher price for coal in the open market, when he was selling it for the figures for which he originally contracted; and, while we think this has nothing to do with the liability of the defendants, yet it shows at least that the plaintiff is not standing upon a legal right, without merit. Nor do we think

that the contracts with the Keystone Coal & Coke Company and their contract with the Sonman Shaft Coal Company have any bearing upon the question of the defendants' liability on their contract, other than as evidence for the defendants in establishing their defense that shortage of cars was the cause of their failure to comply with the contract, and that they had used every precaution to be so situated as to be able to deliver the coal in compliance with the terms of their agreement, and that it was the subsequent unusual demand for cars, bringing about a shortage in the transportation of the coal, which was the cause of their failure to supply the coal. It does not follow, however, that, because they took the precaution to make these contracts for this coal before they sold it, they would be excused from further effort to secure cars or to procure coal for delivery, when and if, as a matter of fact, they could have, by reasonable expenditure of money, purchased Sonman Shaft coal in the open market, or secured the cars to ship the coal for which they had contracted.

The principal question submitted to the jury was whether the defendants' failure to comply with their contract in the delivery of coal was caused by shortage of cars, which the defendants were unable to overcome, and it involved a number of subordinate questions, all of which were submitted to the jury, and their finding was against the defendants' contention. The evidence was not such as to enable the court to say, as a matter of law, that they should find either of these questions in favor of the defendants. They were fairly submitted to the jury, whose province it was to determine whether the plaintiff or defendants were in the right. They found, after allowing the amount claimed by the defendants as a set-off, a verdict in favor of the plaintiff in the sum of $12,090.37. There was nothing to show that there was any effort on the part of the defendants to comply with their contract, other than the fact that they made the contracts with other concerns to supply the coal for which they contracted with the plaintiff, and went several times to see the railroad company about cars, and had a man at the mines to keep tab on the cars shipped from there on their contract with the plaintiff. They made no effort to purchase coal in the open market, and made no effort whatever in any other direction to secure cars in addition to those that were apportioned by the railroad company to the Sonman Shaft mines. On the other hand, there was some evidence to show that additional cars could be had by paying some additional price.

And as to the question of the defendants' liability to other parties to whom they delivered Sonman Shaft and other coal, the evidence was such that the jury could fairly find that there was no liability to others for this coal on the part of the defendants. Upon the whole evidence, it was a question for the jury, and there has been nothing to convince the court that their finding should be disturbed.

Motion for a new trial is overruled.