## PRODUCERS' COKE CO. v. McKEEFREY IRON CO.*

(Circuit Court of Appeals, Third Circuit. July 13, 1920. Rehearing Denied. September 16, 1920.)

### No. 2517.

1. Sales ⊕━71 (1)·—Contracts of dealer for sale of coke construed.

Under contracts between plaintiff, a user, and defendant, a dealer in coke, which ·did not produce, but bought, the coke in which it dealt, for the sale and purchase of coke to be delivered by daily shipments to plaintiff, and providing that, "if there should be a shortage of cars, shipments shall be divided from time to time in fair proportion on all orders," defendant *held* bound, during a time of car shortage, to make deliveries of all coke it then had wherever obtained, in fair proportion on its outstanding contracts,· and its purchase and resale of coke in the open market on spot orders, while shipping to plaintiff only its proportion of that received on covering contracts it had made with producers, *held* a violation of the contracts.

2. Sales ⊕━83—Construction of contract by parties as to duty to furnish cars governs.

A provision of contracts for the sale and purchase of coke, to be delivered "f. o. b. open top cars ovens," *held* not to require purchaser to furnish cars at the ovens, where during the several months of performance the cars were provided by seller with no demand on the purchaser for cars, and where seller was not a producer, but bought its coke from different producers, and no notice was given purchaser from what ovens shipments were to be made.

3. Sales ⊕━176 (6)—Payment in ignorance of facts does not estop to allege breach of contract.

The rule that a voluntary payment made by a purchaser for a commodity claimed by the seller to be in fulfillment of the contract concludes the purchaser *held* not applicable, where a seller of coke claimed that short deliveries were excused under the contract because of a shortage of cars, and the purchaser did not discover until after making ·payment that the seller had diverted shipments to other purchasers in violation of the contract.

. Buffington, Circuit Judge, dissenting.

In Error to the District Court of the United States for the Western District of Pennsylvania; Charles P. Orr, Judge.

Action at law by the McKeefrey Iron Company against the Producers' Coke Company. Judgment for plaintiff, and defendant brings error. Affirmed.

⊕━For other cases see same, topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

*Certiorari denied 254 U. S. —, 41 Sup. Ct. 147, 65·, L.· Ed. —.

W. J. Brennen, of Pittsburgh, Pa., and S. J. Morrow, of Uniontown, Pa. (W. J. Sturgis, of Uniontown, Pa., of counsel), for plaintiff in error.

Reed, Smith, Shaw & Beal, of Pittsburgh, Pa. (William M. Robinson and Samuel McClay, both of Pittsburgh, Pa., of counsel), for defendant in error.

Before BUFFINGTON, WOOLLEY, and HAIGHT, Circuit Judges.

WOOLLEY, Circuit Judge. McKeefrey Iron Company, a Delaware corporation (plaintiff below), operated a furnace at Leetonia, Ohio. Producers Coke Company, a Pennsylvania corporation (defendant below), was a dealer in coke at Uniontown, Pennsylvania. The Coke Company had no ovens of its own and therefore did not produce coke; it bought coke from producers and sold it to coke users both on commission and its own account. The character of its business has a decisive bearing on this controversy.

In 1916 the parties made three contracts for the sale of Standard Connellsville Furnace Coke, differing in no important respect except as to quantity, price and periods of delivery. The Coke Company made monthly deliveries throughout the life of the contracts and the Iron Company made monthly payments. During the running of the contracts several things happened: First, a car shortage; second, a substantial rise in the price of coke; and third, reduced deliveries by the Coke Company. After the expiration of the last contract, the Iron Company brought this suit to recover from the Coke Company damages for its failure to deliver the full quantity contracted for. The verdict was for the Iron Company. To the judgment entered, the Coke Company sued out this writ of error.

[1] This action arose out of opposite interpretations which the parties placed upon the contracts and is brought here to review still another construction which the trial judge gave them in his rulings on evidence and instructions to the jury.

As the controlling provisions of the three contracts are in the main alike, a recital of the first contract will serve all purposes of this discussion. It is as follows:

Producers' Coke Company

First National Bank Building

Contract No. 654.                    Uniontown, Pa., July 26th, 1916.

McKeefrey Iron Company, Leetonia, Ohio, Agrees to Buy:

and

Producers' Coke Company, Sales Agents, Uniontown, Pa., Agrees to Sell:

Material—Standard Connellsville Furnace Coke in open top self-clearing cars.

Quantity—Eight to Nine Thousand Tons per month August and September, 1916, and Four to Five Thousand Tons per month October, November and December, 1916.

Rate of Shipments—Approximately equal daily.

Price—Two Dollars and Fifty Cents ($2.50) per net ton f. o. b. open top cars ovens.

Terms—Net cash the 20th of month for preceding month's shipment. Railroad weights at shipping point to govern settlement.

Ship to McKeefrey Iron Company, Leetonia, Ohio.

Each month's delivery is to be considered and treated as a separate and independent contract.

In case of strike or combination of workmen, accidents or any other cause or causes unavoidable or beyond their control, causing a stoppage or partial stoppage of the works of either the producer or of the consumer of the coke hereby contracted for, or unavoidable delay in shipment, delivery of material hereby contracted for may be partially or wholly suspended (as the case may be) during the continuance of such interruption; such suspension, however, shall not in any wise invalidate this contract, but on resumption of work the delivery shall be continued at the specified rate, and no liability shall be incurred by either buyer or seller for damages resulting from such suspension of shipments.

It is understood and agreed that if there should be a shortage of cars, shipments shall be divided from time to time in fair proportion on all orders.

In Duplicate.

Accepted: McKeefrey Iron Company,
By N. J. McKeefrey, Secy.

Accepted: Producers' Coke Co., Sales Agents,
By C. E. Lenhart, Vice President.

It seems from the course of this litigation that these contracts contain controversial elements in considerable number and variety. Indeed, counsel for both sides evidently regarded this case, as bearing upon transactions between purchaser and coke dealer, to be of importance to the industry equal to the case of McKeefrey v. Connellsville Coke & Iron Co., 56 Fed. 212, 5 C. C. A. 482, bearing upon transactions between purchaser and coke producer, and believed that the decision in this case will, as between purchaser and dealer, constitute an authoritative rule of conduct as decisive as that pronouncement was of transactions between purchaser and producer. Upon first view we too so regarded the case, but upon second view it appears that this case is not of that rare and exceptional kind which arises but occasionally, in which radically new principles are found to be involved and from which new rules emerge; but is like most cases in that its decision rests upon its own facts and extends little beyond its own area. Therefore, in order that the precise scope of this decision may not be misunderstood, we shall endeavor very carefully to state the true questions involved. To do this we find it necessary first to rid the case of some confusion by stating what questions are not involved.

The Iron Company claimed under its interpretation of the contracts that the Coke Company's promise to make monthly deliveries of coke in named amounts required it to make up by increased deliveries in one month any shortage in deliveries of a previous month and in the end to deliver the full tonnage contracted for, notwithstanding the clause in the contracts that "Each month's delivery is to be considered and treated as a separate and independent contract." The trial court ruled against this construction, and as the Iron Company did not appeal, that question is not before this court.

The Iron Company further contended that the undertaking of the Coke Company to deliver coke in the quantities and periods named

was absolute and unconditional; and that, being a dealer in coke, not a producer of coke, the Coke Company's liability to make full deliveries, monthly and in the aggregate, was not limited or otherwise affected by the car shortage clause of the contracts. The court did not sustain this contention. As the Iron Company did not appeal, that construction also is not before us for decision.

What the court did was not to construe the contracts with reference to the absolute unconditional liability of the Coke Company to make deliveries, or with reference to the Coke Company's liability to make deliveries as its supply was curtailed by car shortage, but simply to hold the Coke Company liable to divide all coke it had actually in its possession or actually within its control (except coke it handled as agent) "in fair proportion on all orders" according to the letter of the contracts; that is, on all contracts on hand when the critical car shortage situation arose and during its continuance. It is this construction of the contracts which is the main question brought here for review, and which, accordingly, limits the range of our inquiry and the scope of our decision. Whether error is involved in this construction depends not upon the words of the contracts alone but upon the conduct of the parties under them. What the Coke Company did was this:

When it entered into the three contracts with the Iron Company, it at once entered into covering contracts with three coke producers for coke sufficient, if delivered, to meet all contract requirements. Being a large dealer in coke, buying and selling indiscriminately throughout the trade, the Coke Company did not intend to restrict its deliveries to the Iron Company to coke received under its covering contracts. In fact, it delivered to the Iron Company only about 5,000 tons of coke procured under such contracts; its remaining deliveries being made of coke gotten from twenty-five other plants.

In the beginning conditions were normal and deliveries full. Presently there developed a car shortage and a consequent reduction in deliveries to the Coke Company on its covering contracts, and reduced deliveries by the Coke Company to the Iron Company under the contracts in suit. The Coke Company excused its reduced deliveries because of the shortage in cars and justified them under the car shortage clause of the contracts upon the representation that its deliveries corresponded with the car supply as indicated by the percentages daily given out by the carriers. Whether deliveries by a dealer as distinguished from deliveries by a producer on the percentage of car shortage is or is not a valid compliance with a dealer's contract containing a car shortage clause is still another question not in this case, because the Coke Company did something more.

When the shortage in cars came, the Coke Company, procuring coke not by production but always by purchase, continued to receive some coke on its covering purchases and to buy coke wherever it was available just as before. But instead of dividing among its existing contracts coke thus newly purchased, it sold it to others in the open market for cash and immediate delivery. For its right to do this, the Coke Company claimed that, under car shortage conditions, it bought

coke and sold it "spot"; that coke which it bought for spot sales was not available for apportionment among and delivery under its running contracts; and that coke applicable to these contracts was only such as was otherwise available under the conditions. Hence the pertinency of the court's ruling that what coke the Coke Company had—howsoever gotten and without regard to its proposed disposition,—was available for delivery and should have been delivered in part upon the contracts in suit under the car shortage clause which required coke, in such event, to "be divided from time to time in fair proportion on all orders." Realizing some force in these words of the contracts, the Coke Company maintained that spot sales of coke were in substance sales on orders, and in estimating the "fair proportion" of coke deliverable under the contracts in suit spot sales or orders for immediate delivery should be included. But the court ruled that the words "all orders" include all contracts for delivery except spot sales made after the stringency of car shortage arose, and of course except sales made as agents for producers; and that, if the jury found the Coke Company had in its possession or control coke which could have been delivered to the Iron Company under the contracts in suit but was diverted to deliveries upon spot sales, they should render a verdict for the Iron Company based on the difference between what would have been a ratable distribution of the coke in hand on running orders and the distribution actually made.

Whether the court committed error in so charging the jury depends upon the true construction of the contracts, not in their entirety, but to the extent involved in the instructions. What the parties meant by their contracts is, under familiar canons of construction, to be gathered from the words they used, the subject matter with which they were dealing, and the situation, present and prospective, which they contemplated. If these were contracts between purchaser and producer for the sale of coke, we apprehend all would agree that the contracts would be interpreted and conduct under them would be controlled by the decisions in McKeefrey v. Connellsville Coke & Iron Co., 56 Fed. 212, 5 C. C. A. 482; Jessup & Moore Paper Co. v. Piper (C. C.) 133 Fed. 108; Haff v. Pilling (C. C.) 134 Fed. 294. But these are contracts by a dealer for the sale of coke to a purchaser; that is, contracts by one, who, not producing coke, had to purchase it from producers in order to deliver it under sales to others. Analyzing the contracts discursively, without construing any part of them not involved in the rulings of the trial court assigned as error, it would seem that down to the clause providing against strikes and other contingencies (with which we are not here concerned) they constitute an absolute and unconditional sale of coke at fixed prices and fixed periods of delivery. As the Coke Company did not have the coke when it sold it, and as it did not produce coke, it had to buy it before it could deliver it. So far as the contracts show the Coke Company was free to procure coke to meet these contracts in any way it chose; that is, by entering into covering contracts, thereby establishing once and for all its profit in the transaction; or by postponing purchases until the periods of delivery approached and then buying it

from the market, thereby speculating as to its profit. Whether the Coke Company covered immediately or deferred its purchases was its affair; and whichever it did, it also would seem, would not change its liability to make deliveries according to the terms of its contracts. This would appear to be the meaning of the parties as disclosed by their agreement down to the strike clause; or, for our purpose, down to the car shortage clause. By this clause—the last in the contracts— the parties said:

"It is understood and agreed that if there should be a shortage of cars, shipments shall be divided from time to time in fair proportion on all orders."

This clause in the contracts had a meaning when written; it also had a bearing on all that happened afterward. If the Coke Company covered (as it did in this case), or if it did not cover and had to go upon the market in a period of car shortage to get coke with which to carry out the contracts in suit, the car shortage clause would, doubtless, require construction in order accurately to determine whether the Coke Company had made deliveries according to its undertakings. In either instance the Coke Company's ability to get coke under its covering contracts or on the market as limited by the car supply might conceivably affect its liability to make full deliveries under its contracts, and might, accordingly, reduce its liability to correspond with the car shortage percentages announced from time to time by the carriers. But however that may be, it is not involved in this case. The Coke Company *got* coke during a car shortage. It got it from two sources: First, under its covering contracts; and second, on the market. *Having* coke, the learned trial judge said in effect: It is not necessary to construe the car shortage clause in order to exonerate the Coke Company for failure to make full deliveries, for there is here involved no question of the Coke Company's inability to get coke because of lack of cars. It had coke; it had it in large quantities; and it had it in cars.

Therefore, having coke and having it on wheels, the learned trial judge limited his construction of the car shortage clause to the Coke Company's liability as declared therein to divide the coke *which it actually had* "in fair proportion on all orders." But the Coke Company said (favorable to it as this instruction was), the words "all orders" in the contracts contemplated spot sales as orders, quite as well as running contracts, among which such coke on hand should be divided. The trial judge found no expression in the clause that denoted this intention and declined to find such intention by implication, holding that an agreement so interpreted would put it within the power of the Coke Company, by increasing its spot sales and making deliveries thereupon from its fixed supply, to pare down deliveries under the contracts in suit to negligible amounts, conduct clearly not contemplated by the parties and clearly inhibited in like transactions between purchaser and producer under the decisions in Jessup & Moore Paper Co. v. Piper and Haff v. Pilling, supra.

Turning to the evidence giving by tabulation all coke shipments of the Coke Company during the car shortage period in controversy,

we take one item as illustrative of the others. For one month the table shows the following:

| 1916 | Contract Coke Shipped | Spot Coke Shipped |
|---|---|---|
| September | 112,024.21 tons | 11,384.20 tons |

The total of these items is 123,408.41 tons of coke. Therefore, in that month the Coke Company had in cars coke in the amount of this total. By selling and shipping 11,384.20 tons spot, the Coke Company diverted that tonnage from contract deliveries and in the same measure reduced deliveries on the contracts in suit. In other words, if the Coke Company had not sold this tonnage spot, it would have had it to apply to its running contracts; but by selling and delivering it spot, it to that extent diminished its capacity to make deliveries on its running contracts. Such action we find, in accord with the learned trial judge, was not intended or agreed upon either expressly or impliedly by the contracting parties. The ruling of the learned trial judge on offers of evidence and his instructions to the jury in this regard were without error.

The evidence of deliveries made on spot sales was quite sufficient to sustain the verdict of the jury under the instructions given.

[2] The remaining assignments of error of sufficient substance to merit comment are three: The first relates to the provision of the contracts:

"Price—Two Dollars and Fifty Cents ($2.50) per net ton f. o. b. open top cars ovens,"

—and is directed to the court's refusal to charge the defendant's point that:

"Under each of the contracts in suit it was the duty of the plaintiff to furnish cars for the shipments of the coke thereby purchased, and if you believe from the evidence that the plaintiff furnished no such cars, your verdict must be for the defendant."

In support of this contention, the Coke Company relies upon a construction which a number of courts, particularly those of Pennsylvania. have placed upon the words "f. o. b cars." It claims that by settled judicial construction this phrase imposes the duty to furnish cars upon the vendee. That such is the general rule was recognized by this court in Davis v. Alpha Portland Cement Co., 142 Fed. 74, 73 C. C. A. 388. Of course, the meaning of the phrase is what the parties intended, and it follows, as recognized in the Davis Case, that where their intention can be gathered from the terms of the contract, or from the interpretation which the parties themselves have given it, or from other circumstances indicating the parties intended something else, the courts will, as of course they must, construe the contract accordingly. Regarding the contracts as the parties contemporaneously interpreted them, it is clear that neither the Coke Company nor the Iron Company expected cars to be furnished by the latter, for throughout the entire life of the three contracts the Coke Company supplied the cars and made no request of the Iron Company for cars. True, an officer of the Coke Company did say to an officer of the Iron Company in explaining

the short deliveries, that the plants couldn't get the cars and if the Iron Company could get cars, it could have the coke. But this was not a request for cars nor an indication that the Coke Company regarded it to be the duty of the Iron Company to supply cars. Looking at the situation generally, it is clear that such was not the Iron Company's undertaking. The Iron Company knew that the Coke Company was not a producer and that it had to buy and did buy coke from many different plants (in number actually twenty-five) to carry out its contracts. The Iron Company, it may be assumed, did not know from what plants the coke was coming. Certainly it was not told to send cars to any particular plants. We are satisfied that in this situation the parties did not intend when entering into the contracts to impose a duty upon the Iron Company impossible for it to perform. Regarding the words of the contracts alone, it is equally clear that the duty to supply cars devolved on the Coke Company, for if it was the duty of the Iron Company to supply them, then the undertaking of the Coke Company to divide shipments in fair proportion on all orders in time of car shortage would be superfluous and meaningless. If the Iron Company had to furnish all cars, there would be nothing for the Coke Company to divide so far as the Iron Company was concerned, because the Coke Company's obligation then would be to deliver only so much coke as the Iron Company would supply cars for.

[3] Referring to the terms of the contracts calling for daily shipments and monthly settlements, and providing that each month's delivery shall constitute an independent contract, the Coke Company presented the following point:

"If you find from the evidence that the plaintiff had notice from the defendant, that defendant claimed the contract fully filled by shipment of a reduced amount, occasioned by a shortage of cars, and refused to ship the remaining tonnage named in the contract, due in any one month, and the plaintiff thereafter paid for coke shipped, such payment was voluntary and cannot be recovered back."

The court refused the point. The evidence to which this point relates would have sustained the finding prayed, had the court charged the point. It is conceded that the Iron Company made monthly payments for previous monthly deliveries and that the Coke Company claimed the contracts filled by the reduced shipments and refused to ship the remaining tonnage, not because of a difference of views as to the terms of the contracts which we regard to be the main question in this case, but because of a claim then asserted by the Iron Company, and later denied by the court, that the contracts were absolute undertakings for full deliveries and were continuing contracts requiring short deliveries in one month to be made up by large deliveries in another.

The Iron Company while conceding the rule relied upon (set out in Armstrong v. Latimer, 165 Pa. 398, 30 Atl. 990, and other cases) holds that it is not applicable here because one of the elements of the rule is, that money thus paid must have been paid with full knowledge of all the facts and without any fraud, duress, or extortion. That this is the general rule there can be no doubt. 38 Cyc. 1298,

and cases there cited. But the evidence shows that the Iron Company made its contract payments upon the Coke Company's assurance that because of car shortage the Iron Company was receiving a fair proportion of shipments as provided in the contracts. This involved not the reduction of coke deliveries because of car shortage alone but the division of coke in fair proportion on all orders. It did not come to the knowledge of the Iron Company until after all payments had been made,—indeed, it developed for the first time at the trial of the case,—that the Coke Company had diverted a portion of its coke supply to spot sales and had divided only the balance on orders of the class of the contracts in suit. On this evidence the rule falls, and the Iron Company is not precluded by what otherwise might have been voluntary payments to assert and recover on a breach of the contracts properly construed.

The remaining assignment of error concerns the ruling of the court on an offer of evidence which in turn involves the particular construction of the contracts we have already discussed. Counsel for the Coke Company asked a witness the following question:

"I want to ask you if you have prepared a schedule showing the percentage of contracts with these other people that you filled during the life of the contracts, including the percentages shipped to McKeefrey."

In support of this question, counsel, addressing the court, said:

"I offer to prove by the witness the amount of the percentage of coke shipped by the Producers Coke Company on these various contracts from any evidence, for the purpose of showing that the distribution going to the McKeefrey Plant on the McKeefrey contract was a fair proportion on all contracts. In other words, they got as large a percentage as they were entitled to get on their contracts *out of the total that we had;* to show that we kept that provision of the contract by which we agreed to make a fair distribution on all orders."

Under objection, the court said:

"In the present state of the proofs, I will have to exclude the offer. I sustain the objection and note an exception for the defendant."

Upon first view this looked like error; but a careful examination of the question asked and offer made, read in connection with the rest of the testimony, shows that what counsel offered to prove, and all he proposed to prove, was the percentage of deliveries made on running contracts without reference to deliveries made on spot sales. As there was no colloquy between counsel and the court,—or, as none appears in the record—we can only surmise the reason which moved the court to exclude the testimony. It is, that, if admitted, the testimony would prove nothing. The offer begged the question; because the evidence if admitted would only show the percentages of shipments made during the car shortage period without showing at all whether the percentages were properly arrived at by dividing shipments "in fair proportion on all orders," excluding spot sales. Hence, this ruling was not affected by error.

After giving this case deliberate and careful consideration, we are of opinion that the learned trial judge had a correct grasp of its intricacies and committed none of the errors charged to him.

The judgment below is affirmed.

BUFFINGTON, Circuit Judge (dissenting). In my judgment, the application to the great coke trade of Pennsylvania of the principle now announced in this case would be, as in the present judgment, to hold that a coke broker's agent who sells for future delivery cannot, during the car shortage periods of the running of the contract, buy any spot coke save at the peril of thereby becoming liable for the difference between the price of such spot coke and the contract price. The grave consequence of such a holding constrains me to respectfully record this dissent.

The present suit was brought by the McKeefrey Iron Company against the Producers' Coke Company, to recover damages for failure to furnish coke on a number of written contracts. Sales of Connellsville coke by coke manufacturing companies to consuming furnace companies are made on written forms of contract such as were used by the parties in this case. That usual form of contract, as will be seen by examination of its entire contents, contemplates that either the manufacturing coke company may be unable to furnish the coke by causes beyond its control, such as strikes, accidents, etc., or that the furnace company may be unable to use the coke by reason of such similar troubles arising in its furnace operation. Therefore, to avoid these impossibilities of shipment from the coke ovens and acceptance at the furnace, the parties provide for the suspension of shipments as noted in the next to the last clause of the contract. In such contract it is moreover recognized that there may be a shortage of railroad cars, and for that car shortage the succeeding clause of the contract provides. It will be understood, of course, that in the usual course of business the coke producer will have other orders from other furnace men, which will cover the entire production of his plant, and in the case of car shortage he equitably prorates his cars among all his orders. This general form of contract is in common use in the coke regions, and the rights and liabilities of the parties were judicially determined many years ago by this court in McKeefrey v. Connellsville Coke & Iron Co., 56 Fed. 212, 5 C. C. A. 482, and have been since acted upon by the trade generally. If the present form of contract were between a coke manufacturer and a furnace company, it could be easily adjusted, but in the present case the form of contract suitable between manufacturer and consumer was used by one who was not a manufacturer, but a mere seller, of coke, and the result is the use of terms which were meant to apply to a different situation. But the terms, whatever they are, are in the contract, and it is the province of the law to construe and apply those terms to a contract made by a seller and not by a producer of coke; and in the final analysis the whole case turns on the construction and practical application of the last clause of the contract, viz.:

"It is understood and agreed that if there should be a shortage of cars, shipments shall be divided from time to time in fair proportion on all orders"

—words easily applicable in case of a manufacturer selling the product of his own plant, but not clear when the seller is not a coke producer.

With the view, therefore, of reasonably ascertaining the true construction of this contract, we look at two things: First, the contract in its entirety, for no contract can be properly construed, save in its entirety; and, second, the situation and surroundings of the parties when they contracted.

Now, taking the contract as a whole and in its entirety, it is an absolute agreement for the sale of a quantity of coke at a fixed price and at fixed times, and, so far as the present suit is concerned, the absolute character of that undertaking is modified and affected only by the provision as to car shortage, which I have quoted. The material is standard Connellsville furnace coke. The quantity is a certain aggregate per month for five consecutive months; the rate of shipment is approximately equal daily shipments, and each month's delivery to be considered as a separate and independent contract. Taking, therefore, say the month of August, 1916, by way of illustration: This contract absolutely bound the seller to ship from 8,000 to 9,000 tons per month during that month, in approximately daily shipments. To make those shipments, it was the duty of the seller to provide cars and deliver the coke f. o. b. in such cars, and in case there was no shortage of cars he was bound to make such deliveries on each day of the month. In case he failed to make such deliveries, he would, of course, be bound for the difference between the contract and the market price for any shortage.

But how about his obligations where there was a shortage of cars? This brings us to the working situation under which this contract was made and had to be fulfilled. Standard Connellsville furnace coke is a well-known subject of sale. It is produced in a limited region, and three great railroad systems furnish the cars and are the gates through which this great traffic of thousands of cars daily passes. The furnishing of coke cars for this great trade is under the joint control of these railroads. Requests for cars are made upon the railroads in advance, and such aggregate requests are tabulated and known. The capacity of the railroads to furnish those cars for each day is also tabulated and known. Hence the relative proportion of cars the railroad can furnish, with relation to the requirements of the region, is well known, and the daily proportion of shortage on the part of the railroads relatively is ascertained certainly. The proportion of car shortage, therefore, being ascertained, how is this provision of the contract, which provides that, "if there should be a shortage of cars," to be applied? How shall, in the words of that provision, the shipments under the contract "be divided from time to time, in fair proportion on all orders"? In other words, what did these men mean when they made this contract? Now, it seems to me that these words simply meant what they said, namely, that where a shortage of cars occurred, and only a proportionate amount of cars could be obtained by any one who wanted to ship coke, he should only be held responsible for the coke which he could ship on such proportionate amount of cars, and that for that part of the shipment for which he could not get cars he was not to be held.

This seems to me the plain, simple thing these business men meant when they used these words, and I am buttressed in that conviction by the fact that to give this simple business meaning to these words makes a rational, workable, and readily adjustable means of settling liability under this contract. For example: On the 1st day of August, it was the duty of the seller to ship approximately 300 tons of coke. Whether it had the coke itself, whether it had it under contract with others, or whether it was compelled to go out in the open market and buy it, made no difference, and its then holding or not holding a supply of coke in no way lessened, increased, or affected its general liability to ship the coke it had agreed to ship. It had sold 300 tons of coke for delivery that day, and it was bound to deliver it at the contract price, if there was no car shortage. But if there was a car shortage, then it was only bound, in my judgment, to deliver the proportionate amount of that 300 tons for which the railroads could furnish cars to the region. Suppose that regional car shortage were 50 per cent, then its obligation was to deliver 150 tons of coke, and if it failed to do so on that day the buyer could go out and purchase coke at the market price, no matter what it was, and charge it with the price of that 150 tons, or with as much of it as it failed to deliver. As to the other 150 tons, which under the contract it would have been bound to deliver in case there had been no car shortage, the car shortage clause excused it, and rightly and fairly excused it, from delivering, for so the contract had provided.

In this way it will be seen that there is a workable basis—practical, simple, easily adjustable—by which the rights and liabilities of these parties could at once be determined by each party, in case of car shortage. The quantum of the daily order and the quantum of car supply were the two elements alone which the parties by their written contract made decisive of their rights. Such being, in my judgment, the true construction of this contract, all questions of other orders, other obligations, other purchases and sales of coke by the seller, are eliminated from this controversy. The contract, as I have said, contemplated an unqualified delivery of a certain quantity of coke each day of the month, at a certain price, and the only thing that excused delivery, but which in fact did excuse delivery when it existed, was the anticipated car shortage. Such being the case, it will be apparent that such elements as the seller having numerous other contracts, as the seller protecting itself against this contract by contracts with coke producers, have no bearing on the determination of the rights of these two contracting parties.

If the Producers' Coke Company had purchased large quantities of coke to fulfill this contract, that did not increase, lessen, or affect its liability. It had contracted to ship coke at certain times, and shipment alone could fulfill the contract. If it purchased no coke to enable it to meet its contract, and was willing to run the risk of the market in buying coke to supply the daily calls of the contract as the need arose, that was a matter of prudence or speculation on the sellers' part; but it could not affect his contract duty to ship on certain days. Moreover, I am justified in saying that this contract was not

267 F.—3

intended to prevent the seller of coke from making other purchases and sales of coke, for it nowhere says so. In the absence of such stipulation, it is unreasonable to hold that by business implication this contract meant that a broker or seller of coke could only engage in buying and selling in his business at the peril of thereby subjecting all his business operations to the domination of this contract. In that connection, it will be noted that, in the practice of the coke regions, some owners of coke ovens contract in advance for the sale of all their supply. Other oven owners refuse to contract in advance for the sale of their whole product, and prefer to sell their product from day to day. Still others make time contracts for part of their output, and leave the other part unsold, so that they can take advantage of any rise in the market.

These practices among coke oven owners lead to there always being for sale and practically immediate shipment or delivery what is called "spot" coke. The existence of this spot coke in no way affects car supply, for the owner of the coke oven, whether he has sold on time contracts or has kept his product unsold, is entitled to call on the railroad for cars to the capacity of his mine, and on such capacity he is entitled to get a proportion of cars in times of car shortage. Seeing, then, that the existence of spot coke on the market and on the cars for immediate delivery are legitimate conditions in the trade, and that such dealings in spot coke on the part of the brokers and coke sellers is not only legitimate, but affords a means of furnishing, for immediate delivery, to manufacturers whose calls are imperative and whose furnaces might be jeopardized by car shortage; it will be seen that dealing in spot coke in and of itself affords no evidence of any unfairness. It therefore seems to me that the element of the existence of spot coke on the market, and the purchase and sale of such spot coke by the Producers' Company during the time of the running of this contract, in no way lessened, increased, or affected its liability under this contract, and yet such was its effect under the ruling of the court in the heavy damages imposed by the verdict in this case.

Turning back to the provisions of this contract under discussion: If there was no shortage of cars, this contract construed in its entirety, as it must be, obligated the Producers' Company to ship 300 tons each day through August. If there was a car shortage any day, as in fact there was, it was only bound to furnish such proportion of the 300 tons as was proportionate to the available cars which the railroads could furnish to reach it. It seems to me that this method of construing the contract is the only practical, workable, and reasonable way of applying the language of this exception to the situation which both parties have created, and which both meant should be effected by its terms, and if this view were adopted I feel it would result in as much business certainty in the adjustment of coke contracts between sellers and buyers of coke as the former decision of this court (56 Fed. 212) made a workable path in cases of sales of coke by coke oven owners, under which case, in spite of the vast magni-

tude of the coke business, disputes over such contracts have practically been eliminated from this court in the last 20 years.

These considerations lead me to respectfully record my dissent in the present case.