TRI–BULLION SMELTING & DEVELOPMENT CO. v. JACOBSEN.

(Circuit Court of Appeals, Second Circuit. May 9, 1916.)

No. 101.

1. TRIAL ☞177—DIRECTION OF VERDICT—MOTION—EFFECT.

Where the only question of fact was whether defendant had breached its contract, and both parties moved for the direction of a verdict, the direction of a verdict for plaintiff is a finding that the contract was breached, so that it is immaterial whether the breach was actual or anticipatory.

[Ed. Note.—For other cases, see Trial, Cent. Dig. § 400; Dec. Dig. ☞177.]

2. SALES ☞176(1)—BREACH—EFFECT.

Where the seller notified the buyer that it would refuse to carry out the contract, and the buyer replied, requesting performance, stating that, if the seller failed, he would purchase in the open market and hold the seller for the difference between the contract price and the market price, the seller's breach was not waived by the buyer.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 436, 438, 443, 444; Dec. Dig. ☞176(1).]

3. SALES ☞194—BREACH—ANTICIPATORY BREACH.

Where it had been the custom for the parties to a contract for the sale of zinc to make settlements when convenient, and the buyer was entirely

responsible, the buyer's failure to make a small payment, falling due after the seller had given notice it would breach the contract, did not render the buyer first in default, where it was apparent that the anticipatory breach would result in substantial damages to the buyer.

[Ed. Note.—For other cases, see Sales, Cent. Dig. § 508; Dec. Dig. ⊙=194.]

4. SALES ⊙=418(4)—CONTRACTS—DAMAGES.

Where, by reason of defendant's breach of its contract to deliver ore, plaintiff was unable to procure the same ore, there being none in the market, plaintiff's measure of damages will be determined by the price of the best substitute available.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 1182, 1183; Dec. Dig. ⊙=418(4).]

In Error to the District Court of the United States for the Southern District of New York.

Action by Ernest O. Jacobsen, doing business as E. O. Jacobsen & Co., against the Tri-Bullion Smelting & Development Company. There was a judgment for plaintiff, and defendant brings error. Affirmed.

Writ of error to the District Court for the Southern District of New York to review a judgment in favor of defendant in error (plaintiff below) for $5,847.31 after a verdict by direction of the court. Plaintiff below will be referred to as "Jacobsen" and defendant as "Tri-Bullion."

Milne, Blake & McAneny, of New York City (L. G. McAneny and Richard T. Greene, both of New York City, of counsel), for plaintiff in error.

Sullivan & Cromwell, of New York City (Royall Victor and E. H. Green, both of New York City, of counsel), for defendant in error.

Before WARD and ROGERS, Circuit Judges, and MAYER, District Judge.

MAYER, District Judge. The action was brought by Jacobsen against Tri-Bullion to recover damages in the sum of $25,000 for breach of contract by Tri-Bullion. The essential features of the written agreement, expressing the contract between the parties, were as follows:

(1) Tri-Bullion was to sell and Jacobsen to buy the output of zinc concentrates produced at Tri-Bullion's plant at Kelly, N. M., for a period of two years from November 22, 1911, to November 22, 1913, concentrates to be delivered in as nearly as possible equal monthly quantities, with the agreement by Tri-Bullion that the minimum should not be less than 600 tons per month.

(2) The price was to be arrived at by a method carefully set forth in the agreement.

(3) Delivery was to be made f. o. b. cars at different points.

(4) Payment was to be made by Jacobsen as soon as weights and assays were agreed upon.

(5) Average quotation of the Engineering and Mining Journal for spelter at East St. Louis during the month of arrival at buyer's works was to be taken as basis of final settlement.

⊙=For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The agreement also contained the following clause:

"*Force Majeure.*—Sellers will be relieved from delivering, and buyers from taking the concentrates in case of strikes, fires, wars, revolutions, accidents to machinery, etc., etc., and in case of events of superior force of nature over which they have no control. * * * *"

After a year and a half Tri-Bullion closed its mine, ceased delivering, and notified Jacobsen that it would not make any further deliveries to him; its reasons for this course being that because of the fall in the market price of spelter it could no longer mine the ore at a profit. Prior to July 7, 1913, Jacobsen had heard rumors that Tri-Bullion intended to cease producing and close its mine, and some time around June 20, 1913, Tri-Bullion, on a post card on which it gave advice of shipments of ore, wrote the words, "This is our final shipment."

Jacobsen, after some endeavor, succeeded in obtaining an interview on July 7, 1913, with Paschal, the president of Tri-Bullion, E. P. Earle, its agent (to whom under the contract all payments were to be made), and David Earle, another representative of Tri-Bullion. The position of the Tri-Bullion officials and representatives was that, as the contract had become unprofitable, the company was released from its obligations under the force majeure clause. None of the contingencies contemplated under that clause had happened. Jacobsen protested against this extraordinary attitude and stated that he would hold the company responsible for its breach.

On July 8, 1913, Jacobsen addressed a letter to Tri-Bullion stating that, if it did not immediately resume shipment, he would enter the market for monthly tonnage, charging the defendant with whatever difference he might be compelled to pay as between the contract price and the market price. On the same day Jacobsen wrote E. P. Earle substantially to the same effect and demanding that Tri-Bullion fulfill its contract. On July 9, 1913, Earle wrote Jacobsen, still insisting on the efficacy of the force majeure clause. To this Jacobsen replied on July 10, 1913, repeating that he would enter the market for the quantities still due and charge Tri-Bullion with the difference in price, if any. Jacobsen again asserted that the force majeure clause was not applicable. On July 11, 1913, Earle wrote Jacobsen to the effect that Tri-Bullion did not agree with Jacobsen's contention. Further correspondence ensued at a later date, which did not, however, change the relations of the parties.

The theory of Tri-Bullion seems to be that because, in the letter of July 8th, Jacobsen urged Tri-Bullion to proceed to fulfill the contract, he was thereby precluded from bringing action for an anticipatory breach, but must perform all of the provisions of the contract called for on his part; one of which was to pay the amount thereafter due for ore theretofore delivered and that Jacobsen could sue only for failure to deliver any installment as the installment became due month by month.

[1] The question of fact in the trial court was whether Tri-Bullion had breached its contract. Both parties having moved for the direction of a verdict, and the court having directed a verdict in favor of

plaintiff, that question is disposed of by the verdict, and what the verdict amounts to is a finding that Tri-Bullion broke its contract, and it matters not whether the breach was actual or anticipatory. Wilson v. Knowles, 213 Fed. 782, 130 C. C. A. 440; Reis v. Rosenfeld, 204 Fed. 282, 122 C. C. A. 480; United States v. Two Baskets, 205 Fed. 37, 123 C. C. A. 310; Allegheny Valley Brick Co. v. C. W. Raymond Co., 219 Fed. 477, 135 C. C. A. 189.

[2] Viewed, however, as an anticipatory breach, the action of Jacobsen in writing the letter of July 8, 1913, insisting that Tri-Bullion should carry out his contract, did not, in any manner, cure such anticipatory breach by Tri-Bullion. The persistent position of Tri-Bullion was that it was excused by the force majeure clause—an obvious pretense to avoid the obligations of a contract which had become unprofitable. Jacobsen's letter of July 8th, as the District Judge said, "was an ordinary business letter in which the plaintiff said in substance: 'You ought to perform your contract, and I request you to do so; but, if you do not, I will enter the market, buy zinc concentrates, and hold you for the difference between the cost to me and the contract price.'"

Where a party to a contract insists that he is not under legal obligation to perform the contract, and that insistence is coupled with a continuance of his original stand and refusal to perform, the breach is plain, and he cannot successfully take refuge in the plea that he must be excused because the other party urges that the contract be carried out, failing which such other party states he will be compelled to purchase goods in a rising market. Roehm v. Horst, 178 U. S. 1, 20 Sup. Ct. 780, 44 L. Ed. 953; Marks v. Van Eeghen, 85 Fed. 853, 30 C. C. A. 208.

[3] It is claimed by Tri-Bullion that Jacobsen was first in default, for the reason that, several days after July 7th, Jacobsen, in the ordinary conduct of the contract, would have been indebted to Tri-Bullion in an amount of, in round numbers, less than $2,000 (or about $1,871.35), representing the price of five cars of zinc concentrates shipments. We think the question as to who was first in default was settled by the verdict; but, in any event, this claim was clearly an afterthought.

Jacobsen's responsibility was not questioned; he had already paid Tri-Bullion over $250,000 under the contract during a period when it was unprofitable to him; no demand was ever made for this—to them—trifling sum of less than $2,000, and the practice of the parties was that payment was made when convenient, and that was usually several days after the price had been fixed by the rather elaborate method for determining price provided for in the contract. If Tri-Bullion was guilty of anticipatory breach on July 7th, there was no obligation on Jacobsen's part to pay over this small amount of money to Tri-Bullion, and especially in the face of every reasonable expectation that Tri-Bullion would be called upon to respond in substantial damages to Jacobsen because of loss suffered by Jacobsen in a rising market. Sperry & Hutchinson Co. v. O'Neill-Adams Co., 185 Fed.

231, 107 C. C. A. 337; Whitcomb v. Shultz, 215 Fed. 75, 131 C. C. A. 383.

[4] The only other question in the case relates to the rule of damages which the District Judge applied. There was no market value for Kelly ore because the mine was closed, and the only substitute in the market was ore from the Joplin mines in Missouri. This ore was purchased by National Zinc Company under a business arrangement between it and Jacobsen. It is well settled that, where there is no market, the value may be otherwise determined by the price of the best substitute procurable. Benjamin on Sales (5th Ed.) page 987; Sedgwick on Damages (9th Ed.) § 734; Williston on Sales, § 599; Hinde v. Liddell, L. R. 10 Q. B. Div., 265; Gruen v. Ohl, 81 N. J. Law, 626, 80 Atl. 547; E. W. Bliss Co. v. Buffalo Tin Can Co., 131 Fed. 51, 65 C. C. A. 289. A proper rule of damages having been applied, the amount of the damages was a question of fact, disposed of by the verdict, and not reviewable in this court.

The judgment is affirmed, with costs.