**BLACKMAN v. CRANDELL et al.**
**(No. 8432.)**

(Court of Civil Appeals of Texas. Galveston.
Feb. 5, 1924. Rehearing Denied
Feb. 28, 1924.)

**1. Sales ⬥175, 374—Seller not required to sue for damages on buyer's refusal to accept a portion of the goods delivered; seller excused from performance by buyer's repudiation.**

On buyer's refusal to accept a portion of the goods delivered, and notice to sellers of his repudiation of the contract, the sellers could act on buyer's repudiation and sue at once for their damages, but were not required to do so, and could keep the contract open for both parties until expiration of the time for delivery of the other portion of the goods, in which case sellers were not required to perform their part of the contract unless buyer withdrew repudiation, and were precluded from so doing, if damages would be enhanced thereby.

**2. Sales ⬥181(11)—Evidence held to sustain finding that sellers did not act with reasonable degree of care in not shipping potatoes in box cars in event of shortage in refrigerator cars.**

In sellers' action for buyer's refusal to accept potatoes under a contract entitling sellers to ship the potatoes at the earliest practical date in case of shortage of cars, in which buyer sought to justify refusal to accept potatoes on the ground that they were not shipped within the time specified by the contract, evidence *held* to sustain finding that sellers did not act with a reasonable degree of care in not shipping the potatoes in box cars within the specified time, if precluded from shipping potatoes in refrigerator cars because of shortage in such cars.

**3. Sales ⬥181(11)—Evidence held to sustain finding that sellers' failure to ship potatoes at time specified in contract was not due to shortage in refrigerator cars.**

In sellers' action for buyer's refusal to accept potatoes under contract entitling sellers to ship potatoes at the earliest possible time, in the event of a shortage in cars, in which seller claimed that they were prevented from shipping within the time specified in the contract by shortage in refrigerator cars, evidence *held* to sustain a finding that sellers' failure to ship potatoes at the time specified was not due to a shortage in refrigerator cars.

**4. Appeal and error ⬥1001(1)—Verdict of jury on special issue, amply supported by evidence, not disturbed.**

Verdict of jury on special issues, where amply supported by evidence, will not be disturbed on appeal.

Appeal from District Court, Harris County;
Ewing Boyd, Judge.

Suit by H. B. Crandell and another against Ed. Blackman. From judgment rendered, defendant appeals, and plaintiffs cross-appeal. Affirmed.

Jones & Roberts and D. A. Simmons, all of Houston, for appellant.

Baker, Botts, Parker & Garwood, Rodman S. Cosby, and Winston Carter, all of Houston, for appellees.

LANE, J. This is a suit brought by H. B. Crandell and L. L. Melcher, engaged in the produce business in the city of Denver, state of Colorado, under the firm name of Rhodes Company, against Ed. Blackman, a produce dealer in Houston, Tex., to recover damages for the alleged breach of two contracts which had been entered into between said parties, whereby the plaintiffs 'agreed to sell and deliver to the defendant 10 and 2 cars of potatoes, respectively, and by which the defendant obligated himself to take and pay for said potatoes the contract price under the terms of said contracts.

The contracts read, respectively, as follows:

"This agreement, made and entered into at Denver, Colorado, this second day of April, 1920, between Rhodes Co., of Denver, Colorado, a partnership, and Edward Blackman, of Houston, Texas, an individual, wherein Rhodes Co. sells and Edward Blackman hereby purchases ten (10) cars of Idaho potatoes at one dollar and seventy-five cents ($1.75) per hundred f. o. b. Idaho, to consist of five (5) cars of Netted Gems and five (5) cars of Rurals, to be packed in new bags and grade Idaho Us. S. Number One's for shipment during the last half of September and the last half of November, 1920, cars to be approximately thirty-six thousand pounds (36,000), shipment to be made from Cassia and Minidoka counties, to be shipped at the option of Rhodes Co. as aforesaid to Edward Blackman at Houston, Texas.

"It is further agreed that should Rhodes Co. be unable during said time to make shipment of said potatoes on account of conditions beyond their control, such as shortage of cars, weather, strikes, or acts of God, necessitating the holding of said shipments, then the same are to move forward at the earliest practical date, without additional cost.

"Fifteen hundred dollars ($1500.00) to be paid to Rhodes Co. on the signing of this contract as part of the purchase price.

"This contract made and signed in duplicate constitutes an agreement and the liabilities of both parties are limited to the extent and scope of the covenants of this contract.

"Attached flier becomes a part of this contract as per telegram of the Rhodes Co. under date of April 3, 1920.

"Rhodes Co.,
"By H. B. Crandell.
"Ed Blackman."

"Flier: Balance of purchase to be paid on arrival of cars, honoring drafts attached to bills of lading, allowing inspection, said inspection allowed second party to see that this contract as to kind, grade of potatoes and manner of packing is complied with; any legal form of billing to be used."

"This Agreement made and entered into at Denver, Colorado, this twenty-sixth day of

April, 1920, between Rhodes Co., of Denver, Colorado, a partnership, and Ed Blackman Houston, Texas, an individual, wherein Rhodes Co. agrees to sell and Ed Blackman agrees to buy, two cars of Idaho Rural potatoes, at $1.75 (one dollar and seventy-five cents) per hundred f. o. b. Idaho, to be packed in new bags and grade Idaho U. S. No. 1, and for shipment to start about September 15, 1920, and cars to be approximate weight of 36,000 pounds. Shipments to be made from Cassia and Minidoka counties, to be shipped at the option of the Rhodes Co., as aforesaid, during the months of September and October, 1920, to Ed Blackman, Houston, Texas.

"It is further agreed that should the Rhodes Co. be unable during said time to make shipment of said potatoes on account of conditions beyond their control, such as shortage of cars, weather, strikes, or acts of God, etc., necessitating the holding up of said shipments, then the same are to be moved forward at the earliest practical date, without additional cost.

"Three hundred dollars ($300.00) to be paid Rhodes Co. on the signing of this contract as part of the purchase price, balance of purchase price to be paid on arrival of cars, honoring drafts attached to bills of lading, allowing inspection, said inspection allowed second party to see that this contract as to kind, grade of potatoes, and manner of packing is complied with, any legal form of billing to be used.

"This contract made and signed in duplicate constitutes an agreement and the liabilities of both parties are limited to the extent of the covenants of this contract.

"Rhodes Company.
"Ed Blackman."

Defendant, Blackman, paid the plaintiff Rhodes Company the $1,500 and the $300, respectively, called for in the contracts as advance payments, about the time the contracts were executed.

After alleging the execution of the contracts, the plaintiffs further alleged that at the time the contracts were made, and prior thereto, it was well known by both parties that it was customary and usual for the produce trade to make shipments of potatoes from Idaho to Texas during the fall of the year in refrigerator cars, and that the shipment of potatoes in box cars at such time was a hazardous method of shipment; that for more than 60 days prior to the dates upon which the potatoes were to be shipped, plaintiffs placed an order with the railroad company for refrigerator cars for the shipment of the potatoes, which was in plenty of time to expect said cars, but due to a car shortage the refrigerator cars were not furnished in time to make shipments promptly; that as soon as cars could be obtained plaintiffs shipped defendant at Houston, Tex., to wit, on the 5th day of November, 1920, one car of potatoes containing 36,200 pounds; that upon arrival of said car in Houston the defendant wrongfully and illegally refused to accept and pay for said potatoes, whereupon plaintiffs, after proper notice, sold them at auction to the highest and best bidder for

cash, and from such sale only $381.85 was realized after deducting freight and demurrage charges; that defendant, on or about November 1, 1920, and again on or about November 15, 1920, and again on or about November 22, 1920, positively and in unequivocal terms canceled the order for the 10 cars of potatoes, and notified plaintiffs that he would not receive and pay for them, and repudiated the written contract therefor; that at the time of said repudiation plaintiffs could buy the potatoes called for in said 10-car contract for 75 cents per 100 pounds, and that by reason of the repudiation and breach of said 10-car contract by defendant, plaintiffs had been damaged in the sum of $1,989.65; that had defendant not repudiated and canceled said 10-car contract, plaintiffs could and would have shipped said potatoes as per said contract.

Relative to the 2-car contract of date April 26, 1920, the plaintiffs alleged its execution and specially pleaded that portion thereof which was as follows: "To be shipped at option of Rhodes Company as aforesaid to Edward Blackman at Houston, Texas." Plaintiffs then alleged that by the clause quoted, "the plaintiffs meant, and each party understood said expression to mean that the potatoes would be shipped during September and October at the option of Rhodes Company." As to the time for beginning said shipments—at any time along about September 15, 1920, or at a later date, according to the option of Rhodes Company. With respect to the effort to get cars in which to ship the 2 cars of potatoes and plaintiffs' inability to get them in September or October, plaintiffs pleaded as they did as to the 10-car contract. They alleged that, endeavoring to comply with the terms of the 2-car contract, they did on the 2d and 17th days of November, 1920, respectively, ship to defendant one car of potatoes; that said shipments were made as soon as they would secure cars for such shipments; that, upon arrival of said two cars of potatoes in Houston, the defendant refused to accept and pay therefor, whereupon plaintiffs sold the potatoes as best they could and realized only $701.01 therefor, after deducting freight and demurrage charges; that on November 1st, 15th, 19th, and 29th defendant repudiated the order for the two cars of potatoes and notified plaintiffs that he would not receive and pay for them; that at the time of such repudiation plaintiffs could buy said potatoes at 75 cents per 100 pounds; that plaintiffs were at all times ready, able, and willing to perform their part of said contract; and "that by reason of the breach of said 2-car contract plaintiffs have suffered damages in the sum $298.63, which represents the difference between the contract price of said potatoes at $1.75 per 100 pounds and the aggregate: (1) The proceeds of the sale of said

two cars which arrived in Houston, after deducting freight and demurrage; (2) the deposit of $300, made by defendant at the time the contract was executed." The aggregate of damage alleged is $2,888.28, for which judgment is prayed.

Defendant answered by general denial of the allegations of the plaintiffs. Defendant also filed a cross-action praying for the return of the $1,500 paid on the 10-car contract and for the $300 paid on the 2-car contract.

After the evidence had been closed by both parties, the court instructed the jury which had been selected to try the cause to return a verdict in favor of the plaintiffs for the sum of $1,020.80, said sum being the loss sustained by plaintiffs on the 10-car contract, which said instruction was accordingly obeyed.

The issues raised by the pleadings of the parties relative to the 2-car contract were submitted to the jury in special issues, which were answered as follows:

(1) During the month of April, 1920, there was a well-recognized and generally known custom in the produce trade whereby shipments of potatoes during the fall months from the Burley, Idaho, district to points in and around Houston, Tex., would be made in refrigerator cars.

(2) Plaintiffs did not act with a reasonable degree of care, prudence, and foresight in not shipping the two cars under the contract of April 26, 1920, in box cars during the month of October.

(3) That the failure of the plaintiff to ship the potatoes under the 2-car contract was not due to a shortage in refrigerator cars in the Burley district.

Upon the evidence and the finding of the jury upon the issues submitted, the court rendered judgment in favor of defendant for the return of the $300 paid by him on the 2-car contract, with interest thereon from November 1, 1920, which was offset against the said sum of $1,020 found in favor of the plaintiffs, leaving a balance in favor of plaintiffs of $718.60, for which judgment was rendered for plaintiffs against defendant.

From so much of the judgment as is against defendant he has appealed, and the plaintiffs have filed cross-assignments complaining of the action of the court in awarding to the defendant a recovery of the $300 paid by him on the 2-car contract.

For cause of reversal of the judgment, in so far as it affects the 10-car contract, appellant insists that since it was shown by the undisputed evidence that he had, by his letters to appellees, attempted to cancel and repudiate the 10-car contract before the time named therein for the performance by appellees had arrived and expired, and since it was shown that appellees had rejected such attempted cancellation and repudiation, the court erred in holding that appellant had,

as a matter of law, breached said 10-car contract and in instructing the jury to return a verdict for appellees for such loss as was shown to have been sustained by reason of the breach of said 10-car contract by appellant, because, as appellees had rejected appellant's attempted cancellation and repudiation, the contract was kept alive for the benefit of both parties, and before appellees can lawfully recover they must show that they performed their part of the contract; that is, that they shipped the 10 cars of potatoes within the time allowed for such shipment in the contract, and forwarded a bill of lading with draft attached as provided therein, and, as there was no such showing, and as it was shown by the uncontroverted evidence that no such shipment was made by appellees, it was error for the court to hold that appellant had breached the 10-car contract, as a matter of law.

Appellees contend that the potatoes contracted for under the 10-car contract were by the terms of the contract to be shipped in either the last half of October, 1920, or the last half of November of said year, at the option of appellees; that by said terms they had the right to ship all or any number of the cars called for at any time from November 15, 1920, to December 1, 1920, and that, as appellant had repudiated the contract and had positively refused to perform his part thereof, and had refused to accept a shipment of 3 cars of potatoes, shipped to him under the contracts between the parties, appellees were not under obligation to continue to ship said potatoes, but that they might hold the contract open so as to afford appellant an opportunity to recede from his refusal to accept the potatoes until the time for shipment had expired, and then, upon a continued repudiation of the contract by appellant, sue for their damages.

In so far as appellees contend that they had the right under the contract to make the shipment in either the last half of October or the last half of November, appellant has seemingly concurred before, as well as at the time of, the trial of this case, for he testified:

"The reason I sent Rhodes Company that wire on the 1st day of November is, I had 2 cars of potatoes bought to be shipped the 15th of September, and then I had ten cars to be shipped the last half of October or the last half of November, and up to that time they hadn't shipped a single car, and I wired them and asked them to cancel the contract and give me my money back."

Thus it is shown that it was understood by both parties to the contract that appellee had the right to ship the potatoes called for by the 10-car contract at any time in the latter part of November. In these circumstances it becomes unnecessary for us to follow counsel for appellees in their very able and

interesting discussion as to whether the word "and" used in the 10-car contract immediately after the word "October" and immediately preceding the words "last half of November" should be construed to mean "or," or to be substituted by the word "or." It is our duty to construe the contract as it was understood by the parties thereto at the time of its execution.

[1] If appellant informed appellees that he repudiated the 10-car contract and that he would not be bound thereby, before the appellees were required to perform their part thereof, and thereafter refused to receive and accept 2 cars of potatoes shipped to him under the terms of said contract, upon which a loss was sustained, he could not rightfully demand that appellees should continue to ship the potatoes. He could not reasonably insist that appellees were under the legal duty to tender a delivery of the potatoes, upon the grounds that they did not at once reject his repudiation and proposed cancellation of the contract and did not at once file suit for the damage sustained by them by reason of his breach of the contract. Appellees had the right to reject appellant's attempt to repudiate and cancel the contract and to insist upon its performance; and they had the right, upon the continued refusal of appellant to receive and pay for the potatoes, to file suit for the loss suffered by them by reason of appellant's breach of the contract after the time of performance by them had expired. In other words, they had the right to act upon appellant's repudiation and sue at once for their damages, or to keep the contract open, for both parties until the time for performance had expired. Winston on Contracts, § 1337; United Press Ass'n v. National Newspapers' Ass'n, 237 Fed. 547, 150 C. C. A. 429; Tri-Bullion Smelting Co. v. Jacobsen, 233 Fed. 646, 147 C. C. A. 454; Bell v. Hatfield, 121 Ky. 560, 89 S. W. 544, 2 L. R. A. (N. S.) 529; Habeler v. Rogers, 131 Fed. 43, 65 C. C. A. 281; Texas Seed & Floral Co. v. Chicago Seed Co. (Tex. Civ. App.) 187 S. W. 747, and authorities there cited.

Since appellees chose to wait until the stated time for performance they were excused from the necessity of performing on their own part unless appellant, who had repudiated the contract, withdrew his repudiation. Indeed, appellees had no right to perform if it was apparent to them that by so doing damages would be enhanced.

It was shown, we think, by the undisputed evidence, by several letters written by appellant to appellees long prior to the last day of November, 1920, that appellant had repudiated the 10-car contract, that he had positively refused to accept the potatoes under the terms of said contract, and had refused to receive and pay for the 2 cars of potatoes which had been shipped to him thereunder.

Under the law and facts above stated, we do not think the trial court erred in instructing the jury as he did relative to the 10-car contract.

We now come to consider the cross-assignments of appellees complaining of the judgment rendered awarding to appellant a return of the $300 paid by him upon the 2-car contract.

[2, 3] We think there was ample evidence to sustain the finding of the jury that appellees did not act with a reasonable degree of care, prudence, and foresight in not shipping the 2 cars of potatoes, called for by said 2-car contract, in box cars, and to sustain the further finding that the failure of appellees to ship said potatoes was not due to a shortage in refrigerator cars in the Burley district. As already shown, it is provided in the 2-car contract that the shipments were to start about September 15, 1920, but might, at the option of appellees, be shipped during the months of September and October, 1920.

The witness George Booth, a resident of Burley, Idaho, testified he was the agent of the Oregon Short Line Railroad Company at Burley; that some time in October, 1920, the railroad company embargoed the use of refrigerator cars for potato shipping for about one week; that this embargo was placed October 6 and released October 14, 1920; that his records show that in September, 1920, there were 101 refrigerator cars furnished at Burley station and in October 209; that most of the time they had plenty of box cars for potato shipments; that Burley is not the only point for shipment of potatoes out of Cassia and Minidoka counties.

C. B. Quarles, on cross-examination, testified that potatoes were sometimes shipped in box cars; that the custom of shipping potatoes in box cars had been in vogue ever since he had been in the business.

T. S. Kennerly testified that potatoes during the fall of the year are moved in both refrigerator cars and box cars; that the Oregon Short Line accepted potatoes loaded in box cars in the Burley district and in Burley up to the middle of October.

W. F. Hay testified that it was safe to make shipments in box cars to Texas points in October, but that it was unsafe to make them in the latter part of said month and in November; that all shippers prefer shipping in refrigerator cars but they had to use box cars to handle the potatoes in certain times each year; that he did, in October, 1920, ship potatoes from Burley in box cars; that the last shipment so made was on the 16th of October and went to Atlanta, Georgia; that in his experience in shipping potatoes from Burley, Idaho, to outside points, box cars were furnished up to October 15th; that during October and November, 1920, he shipped potatoes in both refrigerator and box cars and had no more trouble with one than the other.

Lincoln Wilder testified that he knew of

no general custom regarding shipments of potatoes from Burley to Texas, that they had shipped potatoes to Texas in box cars up to October 15, and that he had no difficulty or loss on any shipment in box cars.

Several other witnesses testified to facts along the same line as did those named.

[4] That the verdict of the jury to special issues 2 and 3, as above stated, is amply supported by evidence we have no doubt. It therefore becomes the duty of this court to let such verdict stand and to affirm the judgment of the trial court based upon such verdict.

It follows from what we have said that we think the cross-assignments of appellees should be overruled and the judgment as a whole affirmed, and it is so ordered.

Affirmed.