SPERRY & HUTCHINSON CO. v. O'NEILL-ADAMS CO.

(Circuit Court of Appeals, Second Circuit. February 14, 1911.)

No. 113.

1. CONTRACTS (§ 328*)—BREACH—DEFENSES—PRIOR BREACH BY OTHER PARTY.
    Where a contract to furnish plaintiff with trading stamps to advertise its business provided that plaintiff should have the right to add at its own expense such advertising as it might desire in any stamp books or directories of the stamp company which were distributed from plaintiff's store, "such advertising not to be detrimental to the interests of the stamp company," plaintiff was not precluded from suing defendant for breach of its contract arising out of its inability to carry out the same owing to a contract previously made with the S. Company, because certain advertisements put out by plaintiff after the making of the contract

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep't Indexes

with defendant indicated the nature of its contract, from which the S. Company derived knowledge of a violation of its rights in the making of the contract between plaintiff and defendant, resulting in injunction proceedings.

[Ed. Note.—For other cases, see Contracts, Dec. Dig. § 328.*]

2. CONTRACTS (§ 316*)—BREACH—WAIVER.

Where, by reason of a temporary injunction, defendant was prevented from carrying out a part of a trading stamp contract with plaintiff, the fact that plaintiff after the issuance of the injunction continued to buy stamps from defendant under the contract prior to the injunction being made permanent did not waive defendant's breach, which was continued on each succeeding day after the injunction was made permanent.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 1382–1387, 1480–1492; Dec. Dig. § 316.*]

3. CONTRACTS (§ 316*)—BREACH—RIGHT TO SUE—WAIVER.

Where a trading stamp contract bound plaintiff to pay for stamps purchased during one month on or before the 15th of the succeeding month, and on January 15, 1909, it was manifest that defendant had broken the contract and intended to continue doing so, plaintiff lost none of its rights to sue defendant for such breach by withholding the installment due on January 15th for stamps purchased as security for damages it might expect to recover in such action.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 1382–1387, 1480–1492; Dec. Dig. § 316.*]

4. APPEAL AND ERROR (§ 1054*)—RULINGS ON EVIDENCE—PREJUDICE.

Where a case was decided by the court on the issues raised without any reference to testimony improperly admitted, the judgment would not be reversed because of error in its admission.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4185, 4186; Dec. Dig. § 1054.*]

5. DAMAGES (§ 124*)—MEASURE OF DAMAGES—BREACH OF CONTRACT.

Where, in an action for breach of a trading stamp contract, there was no proof from which an intelligent estimate of possible profits could be made, but it appeared that plaintiff had expended over $20,000 in providing machinery, space, etc., for carrying on the work, the court properly limited plaintiff to a recovery of such expenses, and directed a verdict for that amount.

[Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 326–338; Dec. Dig. § 124.*]

In Error to the Circuit Court of the United States for the Southern District of New York.

Action by the O'Neill-Adams Company against the Sperry & Hutchinson Company for defendant's alleged breach of contract entered into between the parties on September 3, 1908, whereby defendant undertook to furnish plaintiff with trading stamps described as "gold standard" stamps, to be used by plaintiff as an advertising medium. At the close of plaintiff's testimony, the trial judge directed a verdict in plaintiff's favor for $22,306.80, and defendant brings error. Affirmed.

W. Benton Crisp (Robert F. Randall and Theodore M. Crisp, of counsel), for plaintiff in error.

Gould & Wilkie (A. C. Rounds and Ernest Stauffen, Jr., of counsel), for defendant in error.

Before LACOMBE, COXE, and NOYES, Circuit Judges.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

LACOMBE, Circuit Judge.  It will be helpful before discussing the issues presented on this appeal to explain what the "trading stamp" business is, and how it concerns the three parties interested in it, viz., the stamp company, the merchant, and the customer who buys goods from the merchant.  The stamp company prints stamps of some selected color containing a design and inscription indicating what they are and the words and figures "10 cents purchased."  Any other sum may be settled upon, but 10 cents is usual, and it will be simpler to assume it is always selected.  These it sells to the merchant in convenient packages or pads for an agreed price.  The merchant, when requested by a customer who has made a purchase, gives him one of these stamps for each 10 cents represented by the retail price of goods purchased for which cash is paid, and agrees that he will not dispose of such stamps otherwise than to such customer upon such terms.  The customer keeps the stamps he gets, pasting them in blank spaces in a small book furnished by the stamp company.  The book contains 10 stamps furnished free by the stamp company, and, when the customer has pasted 990 more stamps in it, the book is filled, and upon its presentation at one of certain designated places, called "premium parlors," the stamp company will give in exchange for it some valuable premium in the shape of an article of merchandise.  If the customer prefers, he may exchange his book for a voucher good for further purchases of merchandise at any one of certain designated stores, to wit, stores which themselves are issuing trading stamps of the same type.  It is understood that the customer in filling his book is not confined to stamps issued in any one store.  He may use stamps of the designated color and type received for purchases of goods, wherever those purchases were made.  This circumstance makes the stamps more desirable for the customer.  The stamp company by advertising, by promises to the public, by the exhibition of goods, by the circulation of books creates a demand for the trading stamps, customers ask for them, and, in order to hold or secure their trade, the merchant finds it desirable to buy them.  The merchant also advertises the type of stamps he issues, and tries to commend it to the customer.  Of course, he must arrange the selling price of his merchandise so as to meet the additional cost to which he is put in advertising in giving away these stamps for which he has paid and in assisting in their redemption.  In like manner the stamp company must so regulate the cost of the "valuable premiums" it gives to customers in exchange for stamps that the money it receives from the merchants will pay all expenses, provide the premiums, and leave a profit.  Ultimately, of course, the money to pay for the entire expenses of the enterprise incurred both by stamp company and merchant comes out of the pockets of the customers.  There is no other place for it to come from.  The price they pay when they purchase from the merchant must be large enough to pay all expenses and give a profit both to the stamp company and to the merchant.  The public, however, apparently does not appreciate this.  By the use of stamps it seems to be getting something for nothing, and it is understood that customers are attracted to a store which gives stamps upon each sale.  Having settled upon its type of stamp, the company se-

cures as many merchants as it can (or thinks it wise to) secure to distribute that particular type, but in so doing it naturally seeks to avoid supplying the same type to two merchants who are competitors in the same line of business, since the value of this stamp distribution to the merchant consists mainly in the circumstance that it is himself, and not his rival across the street, who can give away this particular type of stamp. As defendant's counsel expresses it in his brief:

"In nearly all, if not all, of these contracts made by the trading stamp companies with their subscribers, the right to use them as an advertising medium is restricted to the subscriber. In entering into these contracts merchants are careful to see that they get the restriction referred to."

Inasmuch as it is often more convenient for the customer upon whose good will the success of the whole scheme depends to select his premium or exchange his book for a merchandise voucher in the place where he bought the goods which brought him the stamps, it seems to be usual in the case of a merchant doing a large business to establish a premium parlor in his store. In that way the customer is saved the trouble of a journey to some premium parlor of the stamp company, located perhaps many blocks away.

The defendant, the Sperry & Hutchinson Company, was a pioneer in this business, and the type of stamp it issued known as "Green Trading Stamps," or "S. & H. Green Trading Stamps," has been well known and favorably regarded by the public for many years, being distributed by large numbers of merchants in all lines of business throughout the United States. The corporation known as Siegel-Cooper Company, having a large department store in New York City, became desirous of handling these green stamps, and on April 15, 1903, entered into a contract with the defendant originally expiring in 1909, but by subsequent agreement (October, 1907) extended to 1927. This contract is in the usual form, which need not be recited here, since the important clauses are similar to those contained in the contract sued on, which will be analyzed later in this opinion. It contained a covenant by which the Sperry & Hutchinson Company agreed:

"For itself and its successors and for any stamp company that may hereafter be organized by it (or which it may) either directly or indirectly control, that it will not issue or agree to issue trading stamps to any department store or dry goods store in the borough of Manhattan having more than three hundred employés."

The written contract between plaintiff and defendant, upon which this action is based, was entered into September 3, 1908, and among other things contains the following provisions, defendant being designated "the company" and plaintiff "the subscriber": The company is to deliver and the subscriber to order and receive from the company "its new stamp called the 'Gold Trading Stamp'" in specified amounts for a stated price, payments to be made on the 15th of each month for all stamps delivered during the previous month. These stamps are to be disposed of only to customers upon purchases of goods as indicated supra, and the subscriber agrees not to use any other stamps for similar purposes during the life of the contract.

The company agrees to redeem the stamps with goods or merchandise when presented in lots of 990 in one of its stamp books; also to issue (if requested) merchandise vouchers in exchange for full books of "Gold Stamps," each such book entitling the holder to a voucher good for $2.50 on a future purchase of merchandise from the subscriber. Every such merchandise voucher thus issued and subsequently honored by the subscriber being received from the customer at its face value in payment for merchandise, the company agrees to redeem from the subscriber for $1.87½. There are provisions as to the issuance by the company of directories of merchants giving this type of stamp and as to advertisements therein; also as to special issues of double stamps to customers from time to time; and as to other matters which need not be recited. It is agreed that, if at any time the company shall be relieved from the restriction in its contract with Siegel-Cooper Company operating against the customer having Sperry & Hutchinson green stamps, then the subscriber shall have the option of installing said green stamps in their store on the same terms as they are supplied to a named firm in Baltimore.

In the sixth clause it is provided that the subscriber shall supply without expense to the company a space for the installation of agents of the company for the purpose of exchanging "Gold Stamps" for merchandise vouchers; also, that it will furnish a space in its store, not less than 2,500 square feet, where the company shall install and maintain a premium parlor. The contract was to run for 3 years, with privilege of extending the term to 20 years. Two clauses which have an important bearing on the present controversy may be quoted in full:

"Fourth. The subscriber shall have the right to add at its own expense such advertising as it may desire in any stamp books or directories of the company, which are distributed from the subscriber's store; such advertising not to be detrimental to the interests of Sperry & Hutchinson Company. Said subscriber also agrees that it will not during the life of this agreement advertise in any manner adverse to the interests of the Sperry & Hutchinson Company, unless the conduct of the company, its officers, agents or employés should warrant such action."

"Third. The company agrees to redeem gold stamps in the same manner and in the same terms in every respect as Sperry & Hutchinson green stamps; gold stamps and green stamps to be of equal value for redemption in premiums; both stamps to be interchangeable for redemption in premiums, that is gold stamps good in green stamp books and vice versa; full books of all gold stamps or full books of part gold stamps and part green stamps or books of all green stamps to be redeemed by the company with regular green trading stamp premiums in any Sperry & Hutchinson parlor in the United States. It is understood, however, that vouchers redeemable in merchandise at the subscriber's store shall only be issued for full books of Gold Stamps only."

Plaintiff was and is a "department store in the borough of Manhattan, having more than three hundred employés." By the terms of the original Siegel-Cooper Company contract defendant had agreed not to issue any trading stamps to any such store. The original contract, however, was modified by a written agreement dated October 7, 1908, between defendant, Siegel-Cooper Company, and the Gold Standard Stamp Company, a subsidiary company organized by defendant to take over and carry out its contract with plaintiff. This modifying contract quotes the clause of the original contract forbid-

ding the issue of stamps to any department store in Manhattan. It then recites that the Gold Standard Company has made a contract for the installation of the trading stamp system of advertising in the stores of O'Neill-Adams Company, "the terms of which contract have been arranged by the Sperry & Hutchinson Company, extracts from which contract are annexed hereto and made a part hereof as Exhibit A." The Siegel-Cooper Company gives its consent and agrees to make no opposition to the carrying out of the terms of said contract, extracts from which are annexed as Exhibit A. It is provided, however, that the premiums given for Gold Standard stamps shall not be of greater value, variety, or. quantity than are given as premiums for the green stamps dealt in by the Siegel-Cooper Company, also that gold stamps shall be given free to O'Neill-Adams Company in no larger quantities than ·green stamps are given free to Siegel-Cooper Company.

This Exhibit A, which is made a part of the modifying contract, contains most of the important provisions of the contract between plaintiff and defendant, either in extenso or in summary, but it wholly fails to quote, to summarize, or to refer in any way to the third clause (quoted, supra) as to redemption of books of mixed stamps. There is nothing, therefore, in this modifying contract which can be held to give the Siegel-Cooper Company's consent to the redemption at a premium parlor in O'Neill-Adams Company's store of books containing the green trading stamps in which the Siegel-Cooper Company had the exclusive privilege of dealing as against all other department stores in Manhattan having more than 300 employés.

The work of installing the new Gold Stamp system in O'Neill-Adams Company's store was gotten in hand the latter part of September and the first part of October, 1908, space was set apart, employés put at work, and advertisements published. On November 11th plaintiff inserted the following in an advertisement of their offers to customers published in the Evening Journal:

"Collectors of S. & H. Green Stamps may redeem full books of Green Stamps in premiums in the premium parlor of O'Neill-Adams Company store. Collectors of green stamps may add to their books or complete their books with the gold standard stamps, and these books when filled will be redeemed in premiums in the premium parlor of the O'Neill-Adams Company store."

Subsequently, on December 17, 1908, it inserted the following in a similar advertisement:

"We give and redeem Gold Standard Stamps in merchandise or premiums as preferred. We redeem full books of S. & H. green stamps in premiums. We redeem mixed books of Gold Standard and S. & H. green stamps in premiums. Visit the parlor, O'Neill Building, 3rd floor."

The Siegel-Cooper Company at once sued the Sperry & Hutchinson Company, and on December 18th obtained a restraining order and gave notice of a hearing of application to make it permanent. It restrained the defendant from redeeming "mixed books" and also "all gold stamp books"; but the latter clause was at once eliminated on defendant's application. Hearing on motion for injunction was adjourned from time to· time, and about January 15, 1909, or a day

or so earlier, injunction was made permanent, defendant consenting, or not opposing. From the time the injunction was first issued, December 18th, defendant obeyed it and refused to redeem "mixed books." Gold stamps, however, were bought by plaintiff and given to customers of plaintiff in compliance with its promises to them. And these were given in large quantities, because the bills against customers for December purchases—always very heavy—were being paid during the month of January. On January 15th plaintiff notified defendant in writing that unless it complied with all the terms of its contract before February 1, 1909, it would treat its continued failure so to do as a total repudiation of said contract, and would consider itself absolved from any further obligation under the same, and would take such action as it might be advised. Plaintiff refused to pay the amount due from it on January 15th for stamps bought during the previous month. The contract having thus come to an end, plaintiff did what it could to keep faith with the customers to whom it had sold gold stamps, and eventually substituted some other stamp for use in its trade.

Manifestly the refusal of defendant to redeem mixed books, as required by the third clause, was a breach of the contract sued upon. It is not understood that this proposition is seriously disputed. Defendant contends that certain other considerations should preclude plaintiff from maintaining an action founded upon such breach.

First. It is contended that plaintiff first broke the contract by publishing the advertisements of November 11th and December 17th above quoted. It is insisted that such advertisements were "adverse to the interests of the Sperry & Hutchinson Company," and as such were prohibited by the fourth clause of the contract, supra. No doubt such publication was adverse to the interests of defendant. It apprised the Siegel-Cooper Company that the synopsis of the O'Neill-Adams contract, which was shown to it when it agreed to modify its own original contract and which was expressly incorporated in the modifying contract, was a garbled one; that the Sperry & Hutchinson Company had carefully refrained from informing Siegel-Cooper Company that it had already itself agreed with plaintiff to redeem "mixed books" and "all green books" in the premium parlor of a rival department store. As a result it began its suit against defendant, and pressed the same to a successful conclusion. Of course, this was adverse to the interests of defendant, which presumably would have preferred to carry out its arrangements with plaintiff without any interference from Siegel-Cooper Company. Nevertheless the advertisement told no more than the truth. Defendant had agreed to redeem mixed books, and such agreement made the stamp books more desirable for O'Neill-Adams customers. It must be supposed that in a business of this sort the customer whose money is to finance the whole scheme may be attracted by being informed fully as to what he will get. The trial judge held that the clause restricting advertising should not be so construed as to preclude plaintiff from stating publicly just what the contract provided. We are inclined to the same opinion, but, if there were any doubt about it, it may be noted that the restriction is itself qualified with the phrase "unless the con-

duct of said (S. & H.) company, its officers, agents or employés should warrant such action." It was the conduct of defendant and its officers in securing a modifying contract from the Siegel-Cooper Company upon a garbled synopsis of the O'Neill-Adams contract which alone made the publication complained of "adverse to the interests of defendant." There is nothing in the suggestion that the advertisement was untrue, because it said "*we* redeem." The meaning that it conveyed was merely that the redemptions would take place at the premium parlor in O'Neill-Adams store. Moreover, if the advertisement indicated that it was O'Neill-Adams Company only—and not defendant—which redeemed the stamps, statement of that fact would give Siegel-Cooper Company no cause of offense against defendant.

Second. It is next contended that plaintiff waived its right to avail of the breach because it continued buying stamps under the contract after the injunction was issued on December 18th. We find no force in this contention. The breach was a continuing one. What defendant would finally do was not certain until the injunction was made permanent. It might make some arrangement with Siegel-Cooper Company which would result in a withdrawal of the injunction suit. Until it was definitely known what the end would be, plaintiff could go on without waiving any of its rights. On January 15th and every succeeding day there was a new breach of the contract.

Third. It is contended that plaintiff broke the contract by not paying on January 15th for stamps purchased during the preceding month. There is no force in this contention. It was then manifest that defendant had breached the contract and intended to continue doing so. Availing of this continuing breach to abrogate the contract, plaintiff lost none of its rights by holding on to the installment then due as security against the damages it might expect to recover in its action for the breach.

Fourth. Rulings as to evidence. It naturally took the trial judge some little time to gather from the voluminous pleadings and documents what were the real issues of the case. While he was doing so testimony, offered by plaintiff, was admitted, tending to show negotiations and conversations between the parties as to mixed stamps prior to the execution of the written contract. This was objected to, and, since there is no ambiguity in the contract about redemption of mixed books, the objection was sound. The trial judge himself reached the same conclusion later and excluded similar testimony offered by defendant. He refused, however, to strike out the evidence on this point already admitted, saying it was not necessary to do so.

We infer he had then reached the conclusion that there was no question as to what the third clause meant. Since the case was not sent to the jury and the court decided all questions raised as to this clause without any reference to the testimony improperly admitted, and we affirm his conclusions, irrespective of such testimony, no reversible error is apparent. In the 181 assignments of error there are many referring to individual bits of evidence. None of these are discussed in the brief. It is sufficient to say that looking over these assignments we find none which would call for a reversal of the judgment.

Sixth. The question of measure of damages is not discussed at all, either in defendant's original or reply brief. There was a request at the close of the case to "go to the jury on the question of damages," which was denied and exception reserved. A brief discussion of this branch of the case is, therefore, all that seems necessary.

It will be remembered that the purchase of stamps by plaintiff did not give it any title to them. It merely thereby secured the privilege of distributing them to its customers. The trial judge correctly stated that the question what should be the measure of damages was an intricate and novel one; no authority (and there were many) which the diligence of counsel could produce being exactly in point. Plaintiff in its complaint had made a claim for lost profits, but, finding it impossible to marshal any evidence which would support a finding of exact figures, abandoned that claim. Any attempt to reach a precise sum would be mere blind guesswork. Nevertheless a contract, which both sides conceded would prove a valuable one, had been broken and the party who broke it was responsible for resultant damage. In order to carry out this contract, the plaintiff made expenditures which otherwise it would not have made. It furnished space in its stores for facilitating the distribution of stamps and redemption of books, it provided machinery in the shape of blanks and forms and clerks for carrying on this work. It advertised the trading stamps extensively, a necessary expense, because, unless their use in plaintiff's store was made known, such use would not attract new customers. The trial judge held, as we think rightly, that plaintiff was entitled at least to recover these expenses to which it had been put in order to secure the benefits of a contract of which defendant's conduct deprived it. All these items were proved by competent proof in dollars and cents and aggregated something over $20,000. We do not understand that the sufficiency of such proof is seriously disputed. Defendant's contention all along was rather that these were not properly elements of damages. If it appeared that by these expenditures some profit was secured to the plaintiff, such profit might fairly be set off against this sum. But there was nothing to show that during these first three months there was any profit from increased sales secured through the use of these trading stamps. Nor would there be any light thrown on the subject if the question to which objection was sustained had been answered. The witness was asked if the business of O'Neill-Adams Company showed an increase of sales for October, November, and December, 1908, over the corresponding months in 1907. Even if it did show such increase no one could tell how much thereof was due to the trading stamps, how much to the opening of the Hudson Tunnel, how much to the restoration of the surface of Sixth Avenue following the completion of the tunnel, how much to the increase of population in Manhattan, how much to the circumstance that O'Neill-Adams Company had been one year longer in business, and how much to the fact that customers had more money and parted with it more readily in the fall of 1908, than in the fall of 1907. There was nothing from which court or jury could form any intelligent estimate of possible profits resulting in those months from the use of these stamps. That

being so, we do not think it was error for the court to take the proved figures as the correct measure of damages, without leaving it to the jury to guess at some possible offset. If he had sent it to the jury, it would have been under instructions that these items aggregating $21,035.87 had been shown by undisputed testimony, that they were legitimate items of damage, and that there was no proof in the case from which they could determine that plaintiff had realized any specific sum as profit from its three months' use of trading stamps.

It may also be noted that, if any particular sum could be determined as the profit from three months' use of the stamps, many times that amount of profits might fairly be presumed to result from a three years' use of the same stamps, of which future profits plaintiff was deprived by defendant's action.

Under the contract, plaintiff was required to pay defendant $1.93 per thousand for stamps. It bought over 12,000,000 of them, and issued all but 1,272,236 of these to its customers. Many of these had been presented and redeemed by defendant. Such as were outstanding when the contract terminated and were subsequently presented by its customers it had to redeem. There is no necessity to give the figures of the calculation, since this branch of the case is not touched upon in the briefs. The trial judge held that plaintiff was entitled to be reimbursed for what it cost to give to the customer what defendant had agreed to give, and to be repaid the money it had paid defendant for the stamps which the termination of the contract prevented it from using. In our opinion, these were proper elements of damage. From the aggregate of all these items, the court deducted the amount due by plaintiff for stamps bought by it, and directed a verdict for the difference, in which we find no error.

The judgment is affirmed.