## PURINGTON PAVING BRICK CO. v. METROPOLITAN PAVING CO.

(Circuit Court of Appeals, Eighth Circuit. March 7, 1925.)

No. 6516.

**1. Sales ⚖══62—Contract for sale of brick held entire and not divisible.**

A contract for sale and delivery of a stated number of brick, for a specified purpose, which required that number, and which provided that settlement for rejected brick should be deferred until final settlement on completion of the contract, *held* not divisible into separate monthly contracts, because of a provision that payment should be made each month for brick delivered during the preceding month.

**2. Sales ⚖══182(1)—Evidence held to require submission to jury of counterclaim for delay in furnishing brick purchased.**

In action for purchase price of brick sold to defendant, evidence in support of a counterclaim based on delay of plaintiff in shipping brick "as fast as possible," as required by contract, *held* sufficient to require its submission to the jury.

**3. Contracts ⚖══316(6)—Waiver of right to terminate contract for breach does not waive right to recover damages.**

A waiver of the right to treat a breach of a contract as a discharge of the contract is not a waiver of the right to recover damages for the breach.

**4. Contracts ⚖══316(1)—Waiver of breach is question of intention.**

Waiver of breach of a contract is a question of intention, based on knowledge of the circumstances.

**5. Sales ⚖══179(3)—Breach of contract held not waived by purchaser.**

The fact that defendant accepted delivery of brick, which it bought and required for a specified purpose, after delivery should have been completed under the terms of the contract, *held* not a waiver of the right to recover damages sustained because of the delay, especially where it was without knowledge that the delay was not due to a cause excepted in the contract.

**6. Sales ⚖══418(7)—Purchaser held, under the facts, not bound to minimize damages for breach.**

A purchaser of brick, which accepted delivery after they should have been delivered, and sustained loss because of the delay, *held* not barred from recovery of damages because it might have minimized the damages by canceling the contract and purchasing elsewhere, when plaintiff was continuously promising delivery.

**7. Evidence ⚖══183(14)—Foundation of secondary evidence of telegram held sufficient.**

Foundation laid for introduction of secondary evidence of the contents of a telegram *held* sufficient to authorize its admission.

**8. Trial ⚖══106—Order of argument to the jury held within the discretion of the court.**

The order in which argument to the jury was made *held* within the discretion of the court.

In Error to the District Court of the United States for the St. Joseph Division of the Western District of Missouri; Albert L. Reeves, Judge.

Action at law by the Purington Paving Brick Company against the Metropolitan Paving Company. From a judgment for defendant on a counterclaim, plaintiff brings error. Affirmed.

Roy B. Thomson, of Kansas City, Mo. (O. H. Dean, of Kansas City, Mo., on the brief), for plaintiff in error.

John E. Dolman, of St. Joseph, Mo., for defendant in error.

Before SANBORN and KENYON, Circuit Judges, and BOOTH, District Judge.

KENYON, Circuit Judge. As plaintiff in error was plaintiff, and defendant in error, defendant, in the trial court, we so designate them in this opinion. The case is here on writ of error from the St. Joseph division of the Western district of Missouri.

Plaintiff brought action to recover the purchase price of brick sold to the defendant under written contract, by the terms of which plaintiff was to furnish approximately 2,590,000 brick to be used for paving in the city of Marysville, Kan., with which city defendant had a paving contract. The contract between defendant and the city provided for the completion of the work within 180 working days from the date of the contract. Under the terms of the contract between plaintiff and defendant, plaintiff was to commence shipment of brick to defendant when ordered, and was to continue to make shipments "as fast as possible," until the entire shipment had been made, un-

less prevented by labor troubles, fire, lack of cars, etc. Defendant was to pay for the brick shipped under the agreement at the rate of $39.19 per 1,000, f. o. b. car tracks at Marysville, Kan. Payment therefor was to be made by defendant on the 30th day of each month for the brick shipped the preceding month, and the contract further provided that, in case freight rates were increased or decreased during the existence of the agreement, the price of the brick should be increased or decreased accordingly. Freight rates were increased on August 26, 1920. Plaintiff continued to send bills for monthly shipments after that time, which were paid without protest by defendant. When all the shipments were received, defendant deducted from the amount due what it had been compelled to pay in increased freight rates, and refused to make payment therefor. For that amount plaintiff sought recovery in the sum of $6,505.52, and on the trial it was admitted that defendant was indebted to plaintiff in that amount on the contract, being the amount of the increase in freight rates after August 26, 1920. Defendant by counterclaim sought to recover from plaintiff damages for delay in the shipment of the brick in question, claiming that plaintiff did not ship the brick "as fast as possible," as provided in the contract; that the order to ship was given to plaintiff in "September," 1919, and that no brick were shipped until April, 1920. Defendant, during the fall and winter of 1919 and 1920, was continually urging shipments, and plaintiff was claiming that the labor situation and car shortage was preventing sending and making shipments as readily as otherwise could be done.

From April, 1920, through the summer, defendant urged shipment of more brick; plaintiff then claiming shortage of cars as an excuse for nondelivery. In September, 1920, when less than one-half of the brick under the contract had been received, defendant again urged delivery of more brick, and so the correspondence runs through the record. The last brick necessary to complete the contract were shipped in December, 1920. During the month of September, 1919, plaintiff shipped 309 cars to other parties than defendant; in October, 1919, 290 cars; in November, 1919, 198 cars; in December, 1919, 13 cars; in January, 1920, 151 cars; in February, 1920, 168 cars; in March, 1920, 213 cars; in April, 1920, it shipped 18 cars to defendant and 156 cars to other parties; in May, 1920, it shipped 28 cars to defendant, and 178 cars to other parties; in

June, 1920, it shipped 31 cars to defendant, and 257 cars to other parties; in July, 1920, 22 cars to defendant and 356 cars to other parties; and from August 1 to August 26, 1920, the date of the increase in freight rates, it shipped to defendant 9 cars, and to other parties 347 cars.

The entire controversy arises over the counterclaim, which is based on the delay in the shipment of cars, it being claimed that, if the brick had been shipped to defendant "as fast as possible," as provided by the contract, it could have completed its work with the city in the 180 working days from July 14, 1919, provided by its contract with the city; that in any event the brick could have been shipped so that defendant could have completed its contract before the increase in freight rates, and hence that it was directly damaged by the delay to the extent of the freight rates. Other damages, such as premium on renewal bond, interest on money borrowed, overhead charges, and other items set forth in the counterclaim, were also claimed.

The jury returned a verdict for plaintiff for $6,505.52, with interest, making a total verdict for plaintiff of $7,318.58, and returned a verdict for defendant upon its counterclaim in the sum of $7,818.58, upon which judgment was duly rendered. Some 40 assigments of error were filed, but only 6 are presented in argument and relied on by plaintiff. We consider them in the order of their presentation.

I. Plaintiff contends that the instruction requested, to find for it upon defendant's counterclaim, should have been given, because it is claimed the uncontradicted testimony shows that labor troubles and lack of cars reduced its normal output; that it was doing everything possible to meet its contracts, and that the record does not show that defendant did not receive during the course of the contract its proportionate part of the reduced output of plaintiff; that plaintiff was supplying brick in some cases under prior contracts for furnishing paving brick, where the concrete had been laid; and that it would have been justified in suspending shipments upon the conditional contracts and meeting the requirements of the unconditional ones. The contract between plaintiff and defendant had in it this provision:

"The party of the first part agrees to begin shipment of brick under the agreement to the party of the second part when ordered to do so, and to continue to make shipments as fast as possible until the entire shipment has been made, unless prevented by labor

troubles, fire, lack of cars, or other unavoidable causes; it being understood and agreed that, if shipments on this agreement are not completed before January 1, 1920, on account of the inability of the party of the second to receive same, then the party of the first part may, at its option, cancel the balance of this agreement."

Shipments under this provision of the contract were to commence when defendant ordered plaintiff to ship. The court left to the jury to determine from the evidence when the order to commence shipping was given. Without reviewing the evidence on that question, it is sufficient to say that the jury would be warranted in finding the request to ship was made as early as August 18, 1919. The evidence is without dispute that no brick were shipped until April, 1920.

From September 1, 1919, to April 1, 1920, plaintiff shipped to other contractors a total of 1,342 cars (13,420,000 brick); none to defendant. From April 1, 1920, to August 26, 1920, the date at which the increased freight rates went into effect, plaintiff shipped 108 cars to defendant (1,080,000 brick) out of a total of 1,399 cars (13,990,-000 brick) shipped. This would seem sufficient to justify a belief on the part of the jury that, as far as defendant's contract was concerned, there was delay in shipment, and that the brick were not shipped "as fast as possible," as provided by the contract. The excuse for the delay was labor troubles and shortage of cars. If the shipments were prevented or delayed by labor troubles or lack of cars, the plaintiff would not be responsible under the contract.

There was some evidence of labor troubles and of car shortage. There was evidence also that the delay was not due to labor troubles. Mr. Terwilliger, secretary of the plaintiff company, testified:

"Q. Now, with the exception of the month of December, which is only half a month, these shipments averaged about the same during each month? A. Except August.

"Q. August it doubled? A. Yes, sir.

"Q. That is when the rate went up? A. 594 in August, 496 in July, 452 in June, and the rest about average.

"Q. So Mr. Terwilliger, you were not prevented by strikes, fires, or labor troubles from shipping that amount of brick during that period of time? A. No, sir."

Again from the record of his testimony:

"Q. So that you were not prevented by labor troubles, strikes, and fires from manufacturing that amount of brick during that time? A. Not that amount. We were prevented from running our plant at capacity."

Under this and other evidence in the record it certainly cannot be claimed with any degree of confidence that the evidence was undisputed on the question of delay as to labor troubles. It was a square question of fact whether these troubles were responsible for the delay.

As to the claim of car shortage affecting shipments, the court instructed the jury as follows:

"Much testimony has been offered touching the ability or lack of ability on the part of the plaintiff to make shipment of brick to defendant. Such testimony shows that plaintiff shipped many cars to other contractors during the time it was claimed that at least a part of such shipments should have been made to defendant. Plaintiff was not obligated under the law to ship all of its brick to defendant, even though by so doing it could have completed its contract at an earlier date, if at the time it was suffering an interference from labor troubles and shortage of cars. In such event it was not required to give preference to defendant, as one of its patrons and contractors, but it could lawfully pro rate its product and transportation facilities among its several customers similarly situated. This does not mean appropriations of its products, to its customers, in accordance with what it might conceive to be their respective needs, but all should have been treated fairly in accordance with their several demands under their contracts."

This instruction was certainly as much as plaintiff could ask. It left to the jury the question as to whether, if there was a car shortage, the plaintiff had fairly prorated the delivery of brick. There was no provision in the contract as to prorating of cars in case of shortage, as there was in the contracts construed in many of the cases cited by plaintiff in its brief, such as in Producers' Coke Co. v. McKeefrey Iron Co. (C. C. A.) 267 F. 22. Nor was the defense of pro rata deliveries pleaded in the present case, and whether or not plaintiff was entitled, as a defense to the counterclaim, to assert and prove that it prorated its cars in time of shortage, the court gave to it that defense and submitted that question to the jury. The law bearing on the question of the defense of prorating deliveries, where the contract cannot be carried out in exactness, is well set forth in Acme Mfg. Co. v. Arminius Chemical Co. (C. C. A.) 264 F. 27, 33, as follows:

"The defendant is entitled to the defense of pro rata deliveries where it finds it impossible, from causes over which it has no control, to fulfill the contract. In such cases defendant is required to do the next best thing, to wit, to apportion the amount available among all its customers, giving to each one his ratable share. This is an exception to the general rule, and is only applied for the relief of an unfortunate defendant who has, by his conduct, shown that he has in good faith made an honest effort to carry out the provisions of his contract. In order to enable a defendant to avail itself of this defense, it must appear that it has treated all customers with absolute fairness, and it must further appear that in the circumstances it had done all that could be expected from one whose purpose is but fair dealing, giving each of its customers the ratable share to which he is entitled under the contract."

In view of the facts hereinbefore pointed out that from September, 1919, to April 1, 1920, defendant received no cars at all, while others received 1,342 cars, or 13,420,000 brick (defendant's contract requiring only 256 cars, or 2,560,000 brick), and that from April 1, 1920, to the time the increased freight rates went into effect, out of shipments by plaintiff of 1,399 cars, or 13,990,000 brick, defendant received 108 cars or 1,080,000 brick, it is apparent that the jury had some basis for finding that pro rata distribution of cars was not fairly made, and that other contractors were favored at the expense of defendant. It appears from the evidence that a stockholder of plaintiff company received 17 cars in August before the increased freight rate went into effect, while defendant received only 9 out of a total shipment that month of 356 cars. It also appears from the record that from the 1st of August to the date when the increased freight rate went into effect the Able Construction Company, with which plaintiff has done business for years, received 103 cars, sufficient for it to finish its contract at Lincoln, Neb., while defendant received its 9 cars.

[1] It is argued as a further reason for giving the requested instruction that the contract in question, providing for full settlement on the 30th day of each month for shipments made during the preceding month makes the contract a divisible one, and each month's delivery and payment a separate transaction. This position is not tenable. The contract is for the furnishing of a specific number of brick for a specific purpose. The purpose required all the brick contracted for. The contract provides: "The party of the second part further agrees to pay the party of the first part or their order on the 30th day of each month for all brick shipped the previous month." The contract further provides: "It is also understood that said second party will make settlement on the basis of the entire quantity of brick shipped each month and that any settlement for rejected brick is to be made at the final payment or after the work is completed." The provision for the monthly payment was a convenience to both parties. It did not change the nature of, or divide the contract into separate parts. The payments were merely part payments upon the whole price and not payments for performance of distinct parts of a contract. The contract was entire. Kelly Const. Co. v. Hackensack Brick Co., 91 N. J. Law, 385, 103 A. 417, 2 A. L. R. 685; Seibert v. Dunn, 216 N. Y. 237, 110 N. E. 447; Prautsch v. Rasmussen et al., 133 Wis. 181, 113 N. W. 416; Barrie v. Earle, 143 Mass. 1, 8 N. E. 639, 58 Am. Rep. 126; Shinn v. Bodine, 60 Pa. 182, 100 Am. Dec. 560; Pakas v. Hollingshead et al., 184 N. Y. 211, 77 N. E. 40, 3 L. R. A. (N. S.) 1042, 112 Am. St. Rep. 601, 6 Ann. Cas. 60; Lumber Co. v. Purdum, 41 Ohio St. 373; Denny v. Williams, 5 Allen (Mass.) 1.

[2] The question of delay, the excuse therefor as to labor troubles, or scarcity of cars, were peculiarly fact questions for the jury. The evidence was in sharp conflict. There was no error in refusing the requested instruction.

II. The second point made is that defendant, by accepting the brick from plaintiff after the time when it is claimed the contract should have been completed and paying therefor without protest, waived objection as to date of shipment, and is now estopped from complaining of the delay. It is urged that strict performance of the contract was waived by defendant, and therefore damages for delay could not be recovered. District of Columbia v. Camden Iron Works, 181 U S. 453, 21 S. Ct. 680, 45 L. Ed. 948; Mound Mines Co. v. Hawthorne et al., 173 F. 882, 97 C. C. A. 394; N. P. Pratt Laboratory v. Buffalo Forge Co., 184 F. 287, 106 C. C. A. 429; Peter St. Clair, Respondent, v. O. F. Hellweg, 173 Mo. App. 660, 150 S. W. 17. These cases are authority for the proposition that, where time is of the essence of the contract and performance does not take place within said time, the party not responsible for the delay may rescind, and that if he does not exercise the right to terminate the contract he will be held to have waived the same.

This is not, however, the situation here. The contract provides: "It being understood and agreed that if shipments on this agreement are not completed before January 1, 1920, on account of the inability of the party of the second part to receive same, then the party of the first part may, at its option, cancel the balance of this agreement." It was undoubtedly the intention of the parties, as testified by plaintiff's representative who signed the contract, that the shipments of brick should be completed before January 1, 1920. Time is not made of the essence of the contract. The contract does not give to defendant the right to rescind for 'failure to deliver, but it does give to plaintiff the right to cancel the contract if defendant is not able to receive the brick on or before January 1, 1920.

There was no right granted to defendant to demand delivery at any particular time. It had the right to demand delivery as fast as possible, barring strikes, fire, car shortage, or other unavoidable hindrance. The record shows that up to February 1, 1920, defendant had no knowledge of shipments of brick to other contractors; that it was continually urging plaintiff to make shipments to it. February 1, 1920, plaintiff wrote defendant a letter from which we quote the following: "We are furnishing all contracts according to the date of the contract, and you are right in line to have shipments started at the time mentioned."

It is probable that upon receipt of this letter defendant might have terminated the contract, for the letter indicates that plaintiff was not prorating the deliveries, but was shipping according to dates of contracts. The correspondence shows defendant was having trouble with the town of Marysville because of the delay, and it was under a bond to complete its contract with the city of Marysville within 180 working days from the date of the contract. Under these circumstances, and under the necessities in which it was placed to secure brick to complete its contract, it was not compelled, upon the receipt of the letter from plaintiff indicating that it had breached the contract, to rescind and cancel the same.

[3] The distinction between waiver of a right to treat a breach of contract as a discharge thereof, and the waiver of a right to recover damages caused by the breach, is clearly pointed out in Frankfurt-Barnett Co. v. William Prym Co., Ltd., 237 F. 21, 28, 150 C. C. A. 223, 230 (L. R. A. 1918A, 602) where the court says: "The difficulty in this case has grown out of the failure to distinguish between a waiver of the right to treat a breach of a contract as a discharge of the contract, and a waiver of the right to recover the damages occasioned by the breach. The two rights are distinct and must not be confused. In Page on Contracts, vol. 3, § 1519, that writer correctly says that waiver of the right to treat a breach of contract as a discharge of contract liability may take place without a waiver of the right to maintain an action for damages, and the weight of authority is that it is not such a waiver. And in section 1510 the same writer states that acceptance after breach is not a waiver of a right of action for damages is apparent when it is considered that the party not in default is often constrained by his necessities to take what he can get under his contract when he can get it." Northwestern S. B. & Mfg. Co. v. Great Lakes E. Works, 181 F. 38, 104 C. C. A. 52; Sperry & Hutchinson Co. v. O'Neill-Adams Co., 185 F. 231, 107 C. C. A. 337.

[4] Waiver is a question of intention, and is based upon knowledge of the circumstances. Bennecke v. Insurance Co., 105 U. S. 355, 26 C. C. A. 990; Frankfurt-Barnett Co. v. William Prym Co., Ltd., 237 F. 21, 150 C. C. A. 223, L. R. A. 1918A, 602; Bishop on Contracts, sec. 792; Smiley v. Barker, 83 F. 684, 28 C. C. A. 9.

[5] While defendant might have terminated the contract because of the delay and failure of plaintiff to carry it out, the record shows that defendant did not know until February, 1920, concerning the circumstance of shipments in large amounts to other contractors; that it was continually urging plaintiff to fulfill its contract. It was its privilege under the circumstances to waive any right it might have asserted to discharge the contract, and to hold plaintiff to damages suffered for delay, if plaintiff could not excuse the same under the terms of the contract. In any event, it was not a matter of law for the court to say defendant had waived its right to and was estopped from claiming damages. It certainly cannot be said that the evidence indisputably shows an intention on defendant's part to waive any claim for damages, or that plaintiff, in making shipments after January 1st, understood there was any such intention on the part of plaintiff; nor can it be said as a matter of law that defendant, in accepting shipments after January 1st, misled the plaintiff and thereby estopped itself from claiming damages for the delay. At most, it was a question of fact for the jury under all the

circumstances, and the court instructed the jury as follows:

"The court instructs the jury that plaintiff claims that defendant accepted the brick under the contract in question unconditionally and without protest from time to time until said defendant's contract with the city of Marysville was completed, and that by reason thereof defendant waived its claims for damages set up in its counterclaim. The court, however, instructs the jury that, if you find from the evidence that defendant was obligated under its contract with the city of Marysville, Kan., and under bond with said city to complete its said contract with said city, and if you further find from the evidence that said defendant was constrained by its necessities to take what brick he could get under his contract with the plaintiff, when he could get it, then defendant did not waive his counterclaim for damages, but is entitled to recover such damages, if any, which it may have suffered by reason of any delay, if any, caused by plaintiff in the shipment of the brick called for under its said contract."

There was no objection to this charge, and no exception taken. We think the instruction correctly covered the situation.

[6] III. It is alleged that defendant is not shown to have sustained any damages, and that in no case could it recover more than nominal damages on its counterclaim. Plaintiff argues that there are numerous brick-manufacturing companies in the vicinity of Marysville, and that there is nothing in the record to show that these other companies could not supply defendant with all of the brick needed. Undoubtedly, where a party to a contract can save himself from loss arising from a breach thereof at small expense, it is his duty to do so, and to use reasonable endeavor to reduce the damages. Warren v. Stoddart, 105 U. S. 224, 26 L. Ed. 1117; Kokomo Steel & Wire Co. v. Republic of France (C. C. A.) 268 F. 917.

From the correspondence between the parties it is evident that plaintiff was continually agreeing to ship the brick, and that defendant was expecting month by month to receive it. We do not think, under these circumstances, that reasonable diligence to protect itself from loss compelled buying or attempting to buy the brick elsewhere, and that the jury were warranted in believing that defendant had the right to expect delivery, and no reason, other than continued delay, for expecting nonfulfillment of the deliveries contracted for. Had the brick been received by August 26, 1920, the increased freight rate would not have affected defendant. Other damages shown in evidence likewise would not have been sustained.

In our judgment the court properly stated in its instructions the rule as to measure of damage, to which no objection was made or exception taken.

IV. It is urged that the court committed error in permitting defendant to offer evidence with reference to a conversation between one Dillingham and one Gardner, salesmen for plaintiff company, which conversation was prior to the written contract, and occurred at the time when Dillingham and Gardner were discussing the possibility of the Metropolitan Paving Company and the Galesburg Paving Company figuring together on the contract. In said conversation Gardner agreed that plaintiff could deliver the brick to the Galesburg Paving Company if they secured the contract, or if it was jointly secured. The statement of Gardner to Dillingham was, we think, immaterial, and further incompetent, and should not have been permitted to have been introduced, but the error is not prejudicial. It was merely cumulative to other matters properly in evidence.

Objection also is taken to evidence of what Mr. Gardner stated to the city council of Marysville, prior to the letting of the contract, that "he could cover the town with brick on a short notice." This cannot be said to be an attempt to establish any independent arrangement, or terms at variance with the written contract. It is not a question of oral evidence affecting a written contract, as claimed by plaintiff. The object of the statement apparently was to show that plaintiff had the ability to carry out the contract, if awarded to it; that it had knowledge of the requirements of the city and the obligations carried by defendant. It was natural that the entire matter should be talked over with the city council. Gardner was apparently there for that purpose. The assurance from the representative of plaintiff that it could furnish the brick within the required time was a mere inducement to the making of the contract. We think there was no error in permitting the introduction of the statement of plaintiff's representative, Gardner, to the city council, prior to the making of the contract, as to the ability of plaintiff to furnish the brick.

[7] V. It is urged that the court committed error in permitting defendant to introduce evidence as to contents of a telegram, the original not being properly accounted for. Defendant's superintendent, one Dunn,

testifies as to the contents of the telegram purporting to have been received by one of the engineers on the work from the plaintiff company, to the effect that the brick for the Marysville job was in the kiln being burned, and that shipment would start immediately for the full amount. Of course, the best evidence of the contents of the telegram is the original message, and, unless the original is destroyed, or its loss or absence satisfactorily explained, parol evidence is not admissible.

What is the record here? When the witness Dunn was asked concerning the telegram, and objection was made on the ground that the telegram was the best evidence, he testified that he did not have the telegram; that he did not know where it was; that, at the time he saw it, it was in the hands of one of the engineers of the McCrae Engineering Company, either Mr. Gray or Mr. Hagwood; and, upon objection being made that there was no showing that the telegram had been lost or destroyed, the following took place between counsel for the respective parties.

"Mr. Dolman: Just a little explanation. We agreed before we went into this lawsuit that either side would produce all the papers they had without being ordered to do so by the court, and I asked for this telegram from the plaintiff, and was informed they did not have it. We do not have it, and this is the only means we have of proving it.

"Mr. Langworthy: There is no such telegram in existence, according to my information. I object to counsel making statements of that sort. We have produced anything we have.

"The Court: That will be disregarded by the jury. However, the loss of the telegram has been satisfactorily explained. He testified he received the telegram, and it was in the hands of the engineer, and he does not know where it is, but that it came from the plaintiff company. They should not be barred from the right to testify about it."

The witness was also asked if he knew where either Mr. Hagwood or Mr. Gray was, and he replied that he did not. In view of the statements in the record by counsel for plaintiff that there was no such telegram in existence according to his information, and further, in view of the statements by the witness that he did not have the telegram, did not know where it was, and did not know where the parties were in whose hands he had seen the telegram, we think the court did not err in permitting its contents to be read.

[8] VI. It is contended that the court erred in permitting defendant's counsel to conduct its whole argument after the plaintiff had closed its argument, the opening argument having been waived by the defendant. The matter in dispute before the jury was the counterclaim. The burden of proof was on defendant as to the said counterclaim. Defendant had the right to waive its opening argument. This it did. Plaintiff could have done likewise, but did not. We see no reason why defendant could not use its time to reply to plaintiff's argument, if the court so permitted. The question was one entirely within the sound discretion of the court, and there was no abuse thereof.

We find no error in the record warranting reversal, and the judgment of the trial court is affirmed.